NOLAN, APPELLANT, *v.* STANDARD PUBLISHING CO.
ET AL., RESPONDENTS.

(No. 5,147.)

(Submitted April 10, 1923. Decided May 7, 1923.)

[216 Pac. 571.]

*Libel — Newspaper Articles — When Libelous Per Se—Complaint—Sufficiency.*

Libel—"Inducement"—"Colloquium"—Definitions.
1.  "Inducement" in a declaration for libel under common-law pleading is the narration of the extrinsic circumstances which, coupled with the published language, affects its construction and renders it actionable, when, standing alone, the language would appear either not to affect plaintiff or not to affect him injuriously, and "colloquium" is the allegation that the published language was concerning plaintiff, or him, and his affairs, or him and the facts alleged as inducement.

Same—Complaint—When Insufficient.
2.  A complaint against a newspaper for libel which does not plead special damages does not state a cause of action unless the article published was libelous *per se.*

Same—Newspaper Article Held Libelous *Per Se.*
3.  *Held,* that a newspaper article headed "The White-livered Shyster" which in its body imputed grossly criminal conduct to an attorney, and charging him with "creating sham issues," "preaching violation of the law and defiance of the Constitution he has sworn to defend," "inciting anarchy," *etc.,* was libelous *per se.*

Same—Libelous Article not Naming Plaintiff—Complaint—Sufficiency.
4.  In an action for libel founded on an article in a newspaper concerning a certain class of attorneys styled as "shysters" and referring to incidents occurring at a certain inquest, without, however, naming plaintiff or mentioning any individual in particular, which article was libelous *per se,* the complaint alleging that the matter printed was published "of and concerning the plaintiff" and that readers of the paper understood that plaintiff was the person alluded to, was sufficient under section 9175, Revised Codes of 1921, to permit of proof showing that plaintiff was the person concerning whom the article was published, and was not demurrable.

*Appeal from District Court, Hill County; Charles A. Rose, Judge.*

ACTION by Timothy F. Nolan against the Standard Publishing Company and others. From a judgment for defendants,

3.  Imputation upon lawyer as libel or slander, see note in **Ann. Cas.** 1912A, 376.

on the sustaining of demurrers to the complaint, plaintiff appeals. Reversed and remanded.

*Mr. J. P. Donnelly, Mr. George Bourquin, Messrs. Nolan & Donovan* and *Mr. Harlow Pease,* for Appellant, submitted a brief; *Mr. Pease* argued the cause orally.

Citing: *Paxton* v. *Woodward,* 31 Mont. 195, 107 Am. St. Rep. 416, 3 Ann. Cas. 546, 78 Pac. 215; 13 Ency. of Pl. & Pr., p. 40; *Smith* v. *Coe,* 22 Minn. 276; *Van Slyke* v. *Carpenter,* 7 Wis. 173; *Harris* v. *Zanone,* 93 Cal. 65, 28 Pac. 845; *Van Heusen* v. *Argenteau,* 124 App. Div. 776, 109 N. Y. Supp. 239.

*Messrs. Norris, Hurd, Rhoades & Hauge,* for Respondents Publishing Company and R. R. Kilroy, submitted a brief; *Mr. Edwin L. Norris* argued the cause orally.

The contention of respondents is this: That in spite of the statute relied upon by appellant, if he cannot show by the words used in the article that they were applied to him, then his action must fail. This theory does no violence to the rule in section 9175. If the language used does not apply and cannot be applied to appellant, then his averment that the language was used of and concerning him can be of no effect. (*Van Heusen* v. *Argenteau,* 124 App. Div. 776, 109 N. Y. Supp. 240; *Fenstermaker* v. *Tribune Pub. Co.,* 12 Utah, 439, 35 L. R. A. 611, 43 Pac. 112; *Harris* v. *Santa Fe etc. Co.* (Tex. Civ.), 125 S. W. 77.)

It is evident that the article in question refers to a certain group or class of persons: "Every city has its coterie of shyster lawyers." Evidently the article has reference to shyster lawyers who are stated to be in every city. Where the article as a whole does not appear to refer to any particular individual, but merely attacks a class and there is nothing therein of a libelous character, that by proper inducement or colloquium can be given personal application, no action will lie. (*Comes* v. *Cruce,* 85 Ark. 79, 14 Ann. Cas. 327, 107 S. W. 185; *Bloodworth* v. *Times Pub. Co.,* 128 Ark. 265, 193 S. W.

527; *Lynch* v. *Standard Pub. Co.*, 51 Utah, 322, 170 Pac. 770; *Harris* v. *Santa Fe etc. Co.* (Tex. Civ.), 125 S. W. 77.) Where the words of application designate a class and are so general that no individual damage can be presumed, no private suit can be maintained. (*Wisner* v. *Nichols*, 165 Iowa, 15, 143 N. W. 1020. See also notes to the case of *Levert* v. *Daily States Pub. Co.*, 123 La. 594, 23 L. R. A. (n. s.) 726, 49 South. 206.)

MR. JUSTICE STARK delivered the opinion of the court.

This is an action to recover damages for libel. It is alleged in the complaint that the plaintiff had been duly admitted to practice law in the several courts of record in Montana and in the federal courts, and had practiced his profession in this state for a period of over ten years; that as such attorney he had conducted himself with honesty, fidelity and without misconduct or malpractice in his profession, so that he had come to enjoy, and on May 23, 1920, did enjoy, a good name and reputation both as an individual and as an attorney; that the defendant Standard Publishing Company was a Montana corporation, and the owner and publisher of a daily newspaper of general circulation in this state, called the "Anaconda Standard"; that the defendant R. R. Kilroy was an employee of said corporation, and that the defendant Anaconda Copper Mining Company was the owner of all the capital stock of the Standard Publishing Company, in full charge and control thereof, and directed the editorial policy of said "Anaconda Standard"; and that on May 23, 1920, the defendants, maliciously intending to injure plaintiff in his good name and to bring him into contempt and disgrace, did maliciously compose and publish "of and concerning the plaintiff," in said "Anaconda Standard," the following article:

"The White-Livered Shyster.

"(Substance of replies given by I. W. W. witnesses in the Manning inquest in answer to questions regarding their citizenship.)

"C. M. Sellers, I. W. W. organizer, strike leader, distributor of seditious I. W. W. literature—Doesn't believe in the ballot. Doesn't believe in political action. He is for direct action and the strike on the job. A cook, never worked in a mine.

"A. S. Embree, chief of the strike in Butte, I. W. W. organizer—Twelve years in the United States and not a citizen. Says he believes the Government of the United States is crumbling.

"Ed Dyas, *alias* Larson—Five years in United States. Not a citizen; doesn't want to be.

"John Louma—Ten years in United States, but said he could not talk English. Doesn't want to be a citizen. Wants to go back to Finland.

"James Stevens—A Bulgarian, in the United States twenty years but never made application for citizenship papers.

"Emil Ostovich—In the United States ten years, not a citizen, doesn't believe in citizenship and does not propose to be a citizen.

"Rocco Lavus—Thirteen years in this country. Never tried to become a citizen. Testified he made $9.17 a day the last week he worked in the mines.

"Paul Tarbuck—Fourteen years in United States. Not a citizen.

"Otto Haltio—Six years in this country and not a citizen.

"Oionni Ylonen—Four years in United States. Has never taken out citizenship papers.

"George Dropulio—Thirteen years in America, not a citizen.

"John Maki—Seven years in this country, not a citizen.

"How much money have American wage-earners, native or naturalized citizens, put up in Butte in five years for the sustenance and for the defense of European scum as these, who flaunt their anarchy in the face of decent people?

"Where did this money go?

"Aiding and abetting the alien red and the home-grown anarchist in the assault upon American institutions is found another type of traitor—a type infesting every community; a

type which, because it operates from ambush and conceals its identity behind the mask of an honorable profession, is even more dangerous and more insidious than the dupes and perverts it incites to carry out its ghoulish programs; every city has its coterie of shyster lawyers—the fellows who, before the days of workmen's compensation chased the ambulance to fresh scenes of tragedy and derived a precarious livelihood at the very threshhold of death. Everybody knows the type. Indolent and vicious by nature, they are at once the curse and shame of the American bar. You never see them in court in an honorable lawsuit. They range from the cheap pettifogger of the police court to the white-livered birds of prey who grow fat and prosperous in the smug security of their comfortable offices, inciting anarchy, concocting schemes and rolling poison pellets for thickheaded dupes to scatter.

"Butte has its quota. When Butte was prosperous they were to be seen, down at the heel and out at the elbow. In those days they slept in their offices, and, by cultivating the acquaintance of impecunious constables and petty officers, picked up an occasional fee in a justice court.

"To-day many of them are rich. They own business blocks, drive their own automobiles, take occasional trips to California and show other signs of affluence and ease.

"The source of their income? Trouble! The tithings of the working men and women whom they dupe and on whom they prey. Posing as little brothers of the poor, they grow rich. Creating sham issues, plunging honest but unthinking toilers into strife and industrial warfare, they reap their own golden harvest. It is a well-known fact that many of the seditious utterances appearing in the poison press are prepared in the offices of local shysters and that they have exacted fees from criminals whose very crimes they instigated and for whose vicious acts they are themselves largely responsible.

"A statistical table showing the money lost to working people in Butte during the past five years, by following false leaders, by taking counsel from these jackals of the law, would

make mighty interesting reading. Hundreds of thousands of dollars earned by men who work with their hands have passed into the coffers of these slimy leeches—these pettifogging politicians who would starve to death if obliged to make a living in a community of industrial peace.

"The alien whose record is printed above is a menace—the home-grown anarchist whose leadership he follows is another, but the worst of all the vile crew which to-day curses industrial America are these pirates, who, hiding behind the profession of the law, preach violation of the law and defiance of the Constitution they have sworn to defend.

"Trace back the career of any of them and you will note a strange similarity. Not one of them has ever brought a new dollar to the town—not one of them has ever spent an hour in honest effort. Let any new political pirate craft preying on industry show up in the offing and they get aboard. It makes no difference to them whether it flies the red flag of communism or the black flag of anarchy or murder, that is the flag they follow and that is the flag they serve.

"Do they serve for loyalty to their new found allies? Not at all. For cold. cash. Does ever one of the ambulance chasers contribute his services to 'the cause?' Does he say 'Now boys, you are all out of work and I'll take this case for nothing?' Not he!

"He insists that the hat be passed and the scanty hoard of the unemployed depleted to furnish him a new car, a trip to the coast, where he can stroke a sleek jowl with his lily-white hand and hatch fresh trouble for the victims who have made him rich.

"If any man or woman who works for a living, and who has from time to time contributed to the defense funds and to so-called strike funds, doubts the truth of this statement, let him take from the records the tax rolls of the commercial agency reports, the assets of any one of the little gang of local shysters who for years have posed as defenders of labor and protectors of the poor. Ask them where they got it and how

much of it has come from homes in which it has been a daily problem to meet the grocery bill or the ever-climbing cost of babies' shoes. They can descant about the great, vicious corporations that will 'gobble you up if you don't watch out,' but they won't tell you that seventy-five per cent or eighty per cent, of all the proceeds of the mines goes to labor, that many of the mining companies are not earning enough to pay the interest on their investment, while these hypocritical jackals have doubled their capital in a few years and are piling up immense illicit profits filched from the pockets of the toilers for whom they brew trouble and on whose meager store they draw with Satanic regularity their relentless toll.''

It is then alleged that the newspaper containing said article was extensively circulated and published in Hill county and the several other counties of Montana, following which is paragraph 6 of the complaint, containing these allegations: ''That by the publication of said figures, words, and language as aforesaid defendants intended to and did charge and assert, and intended to be understood as charging and asserting, and by the readers of said newspaper were in fact understood as charging and asserting, that this plaintiff was a white-livered shyster, a type of traitor, and before the days of workmen's compensation chased the ambulance to fresh scenes of tragedy and derived a precarious livelihood at the very threshold of death; that plaintiff was indolent and vicious by nature, was engaged in inciting anarchy, preying upon working men and women, creating sham issues, plunging honest but unthinking toilers into strife and industrial warfare, for plaintiff's personal benefit; and that plaintiff had extracted fees from criminals whose crimes plaintiff instigated and for whose vicious acts plaintiff was largely responsible; that plaintiff was a jackal of the law, a slimy leech, a pettifogging politician and a home-grown anarchist who preached violation of the law and defiance of the Constitution plaintiff had sworn to defend; that plaintiff was a hypocritical jackal and was piling up immense illicit profits filched from the pockets of the toilers for whom

plaintiff brewed trouble and on whose meager store plaintiff drew with Satanic regularity his relentless toll.''

In the next paragraph it is alleged that all of said charges are false and that the same exposed the plaintiff to hatred, contempt, infamy and disgrace, injured him in his good name and reputation as an attorney and as an individual, and had deprived him of gains which would otherwise have accrued to him in his profession, all to his damage in the sum of $25,000, for which amount he prayed judgment.

To this complaint the defendant Anaconda Copper Mining Company filed a separate general demurrer, which was sustained by the court. The defendants R. R. Kilroy and Standard Publishing Company jointly interposed a demurrer, containing four grounds of special demurrer in addition to a general demurrer. This demurrer was also sustained. Plaintiff refused to plead further, and judgment was entered in favor of the defendants, from which plaintiff appeals.

The only matter which it is necessary to consider is whether the court erred in holding that the complaint failed to state a cause of action, for the reason that defendants have not presented any argument on this special demurrer.

Before proceeding with a consideration of the points made [1] on this appeal it will be helpful to set out the meaning of the words ''inducement,'' and ''colloquium'' as they are used in pleadings in jurisdictions where the common-law system prevails, and in which sense they will be hereafter used.

At common law the first essential element in a declaration for libel was styled the inducement, the office of which was ''to narrate the extrinsic circumstances which, coupled with the language published, affects its construction and renders it actionable, when, standing alone and not thus explained, the language would appear either not to concern the plaintiff, or, if concerning him, not to affect him injuriously. This being the office of the inducement, it follows that if the language does not naturally and *per se* refer to plaintiff, nor convey the meaning the plaintiff contends for, or if it is ambiguous or

equivocal, and requires explanations by some extrinsic matters to show its relation to the plaintiff, making it actionable, the complaint must allege by way of inducement the existence of such extraneous matter.'' (Townshend on Slander & Libel, 4th ed., sec. 308.)

Properly the *colloquium*—''is the allegation that the language published was concerning the plaintiff, or concerning the plaintiff and his affairs, or concerning the plaintiff and the facts alleged as inducement. But the term '*colloquium*' is frequently employed as synonymous with inducement, or to signify the inducement and the *colloquium* properly so called.'' (Townshend on Slander & Libel, sec. 323.)

It is first necessary to inquire whether the published article [2, 3] is libelous *per se*, for, if it is not, then the complaint states no cause of action, because it does not plead special damages. (*Brown* v. *Independent Pub. Co.*, 48 Mont. 374, 138 Pac. 258.) It is headed ''The White-Livered Shyster.'' A shyster is said to be a ''trickish knave; one who carries on any business, especially a legal business, in a dishonest way.'' (Webster's Dictionary.) In the body of the publication it imputes grossly criminal conduct to the object of its attack, which gains added opprobrium from the fact that he is a member of an honorable profession ''creating sham issues,'' ''preaching violation of the law and defiance of the Constitution he has sworn to defend,'' ''inciting anarchy,'' *etc.* Certainly such assertions written and published concerning an attorney, if false, would expose him to hatred, contempt, ridicule and obloquy and cause him to be shunned and avoided and tend to injure him in his business, and that would constitute libel under section 5690, Revised Codes of 1921.

The published article does not mention plaintiff's name, nor [4] does it refer to any particular individual, but it is alleged in paragraph 5 of the complaint that the words were in fact composed and published ''of and concerning the plaintiff,'' and in paragraph 6 that they were understood by the

readers of the newspaper as charging and asserting that the plaintiff was one of the persons referred to.

Even without the direct averment last referred to, it is held under statutes similar to ours (which will be hereafter referred to) that an allegation that an article published was "of and concerning the plaintiff" necessarily implies that it was understood by the readers to have reference to the plaintiff. (*Eckert* v. *Van Pelt*, 69 Kan. 357, 66 L. R. A. 266, 76 Pac. 909; *Harris* v. *Zanone*, 93 Cal. 59, 28 Pac. 845; Townshend on Slander & Libel, sec. 97.)

In an exhaustive note to the case of *Levert* v. *Daily States Publishing Co.* (123 La. 594, 131 Am. St. Rep. 356, 49 South. 206), reported in 23 L. R. A. (n. s.) 728, the editor summarizes one of the rules deducible from the American cases on the right of a person not specially named to maintain an action for libel based on charges made against a class or group of persons to which he belongs, as follows: "If the language is employed toward a comparatively small group of persons, or a restricted or local portion of a general class, and is so framed as to make defamatory imputations against all members of the small or restricted group, any member thereof may sue."

In *International Text-Book Co.* v. *Leader Printing Co.* (C. C.), 189 Fed. 86, it was held that, where an alleged libelous article was an attack on a class of persons and corporations engaged in correspondence school education, the fact that it did not expressly refer to plaintiff, a member of that class, did not render it less libelous, when it was alleged that it was intentionally directed at plaintiff and was so understood in the community where it was published and circulated, and that the article was libelous *per se*.

In *Comes* v. *Cruce*, 85 Ark. 79, 14 Ann. Cas. 327, 107 S. W. 185, the following language is found: "The publication as a whole affects only a class, and no malice or ill will of any kind could be legitimately construed to be indulged toward any individual * * * and directed toward him. There being nothing in the article that by proper inducement and *colloquium*

can be given personal application to appellant, the court was correct in holding that no cause of action was stated.'' No statute is referred to in this decision, but the converse of the doctrine announced would be that if there were anything in the article which by proper inducement and *colloquium* could be given personal application to appellant the complaint would have stated a cause of action.

We are of opinion that under the authorities the publication was libelous *per se* as to the plaintiff, if under the allegations of his complaint it is competent for him to show that he is the ''ascertained or ascertainable person'' towards whom the words were directed, and we now pass to a consideration of that matter.

Section 9175, Revised Codes of 1921, is as follows: ''In an action for libel and slander, it is not necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose; but it is sufficient to state, generally, that the same was published or spoken concerning the plaintiff; and if such allegation be controverted, the plaintiff must establish, on the trial, that it was so published or spoken.''

Defendants contend that in spite of this statute, if plaintiff cannot show by the words used in the published article that they were applied to him, then the complaint does not state a cause of action; that, if the language so used does not in its own words in some way identify him as the one of whom they were written, his averment that it was composed and published of and concerning him, in the words of the statute, can be of no avail. In support of this contention counsel cite and rely upon the New York case of *Van Heusen* v. *Argenteau,* which was an action for a libel contained in a letter written to and published in a New York journal that referred to putting dye on a dog exhibited at a dog show, and imputing to some person dishonorable conduct in connection therewith. Assuming that the article referred to her, plaintiff brought action against the

publisher of the journal, alleging that the same was published of and concerning her, under section 535 of the New York Code, which is similar to our section 9175, *supra.* In holding that the complaint was not demurrable the supreme court (appellate division) said (124 App. Div. 776, 109 N. Y. Supp. 239): "I think the article complained of is libelous *per se.* It tends to disgrace or bring into ridicule and contempt the person to whom it relates. [Citing cases.] It does not identify the plaintiff as the person libeled, but the complaint alleges it was published of and concerning her. Being libelous *per se* and not identifying the person libeled, it was unnecessary to allege in the complaint 'any extrinsic fact, for the purpose of showing the application to the plaintiff, of the defamatory matter,' inasmuch as the allegation was that it was published of and concerning the plaintiff (Code Civ. Proc., sec. 535). \* \* \* It appears on the face of the complaint that evidence may be given by the plaintiff which will show that she was the person referred to in the publication. As a pleading, this is all that is required, where it is charged that the matter was published of and concerning her." The case subsequently came before the court of appeals, which held that the letter in question was not libelous *per se* and for that reason reversed the decision of the supreme court (194 N. Y. 309, 87 N. E. 437), but in doing so said: "If the letter is libelous on its face then, under the Code of Civil Procedure, it was sufficient for the plaintiff in her declaration to allege that it was published of and concerning her. \* \* \* Should this allegation be put in issue then she would be bound to prove the extrinsic facts showing the application of libel to her, but she was not bound to allege such facts in her pleadings."

In *Nunnally* v. *Tribune Assn.,* 111 App. Div. 485, 97 N. Y. Supp. 908, a newspaper article stated that detectives were searching for a woman to explain the death of a man who had died after symptoms of poisoning, and that in his delirium he mentioned the name of a young woman who was employed in a downtown wholesale house, gave her home address, and

stated that she was responsible.  Neither the name, the home address, or place of employment of the young woman mentioned was stated in the published article.  The court held that a complaint in libel, based on such publication and stating that it was of and concerning the plaintiff, was not demurrable.

In *Lyons* v. *New York Herald Co.,* 55 Misc. Rep. 570, 106 N. Y. Supp. 874, the complaint set up a publication charging a street-car conductor to have been in complicity with pickpockets on a certain occasion, and the complaint averred that the matter was published concerning the plaintiff, who was a conductor of the particular car which was the scene of the theft.  It was held that a demurrer to the complaint on the ground that there was no sufficient identification of the plaintiff as conductor would be overruled.

Referring to a statute the same as section 9175, *supra,* in *Craig* v. *Pueblo Press Co.,* 5 Colo. App. 208, 37 Pac. 945, the court held that even when the person against whom the libelous charge is made is so ambiguously described that without the aid of extrinsic facts his identity cannot be ascertained, it is sufficient to state generally that it was published concerning the plaintiff and that the averments (inducement) and *colloquium* which were formerly necessary to connect the libel with the plaintiff may be dispensed with.  The same conclusion is announced in *Quinn* v. *Prudential Ins. Co.,* 116 Iowa, 522, 90 N. W. 349; *Dabold* v. *Chronicle Pub. Co.,* 107 Wis. 357, 83 N. W. 639.  That this is the generally accepted construction of statutes like ours is shown by the following statement taken from 13 Ency. Pl. & Pr., p. 40: "In the absence of statute providing otherwise, if the defamatory words are indefinite or ambiguous, and extrinsic facts and circumstances are necessary to show that the plaintiff was meant, the pleadings must set forth such extrinsic facts and circumstances in order to connect the plaintiff with the alleged defamatory matter.  This rule has been changed by the Code.  In the states where the Code practice obtains, it will be sufficient to allege generally that the defamatory words were spoken or published of the

plaintiff, without stating extrinsic facts which show the application of the words to the plaintiff.''

While the identical point here under discussion was not considered in the case of *Harris* v. *Zanone,* 93 Cal. 59, 28 Pac. 845, the construction of the section of the California Code identical with our section 9175, *supra,* was involved, and the court said: ''By this provision the inducement and *colloquium* are dispensed with, and if the words charged are libelous in themselves, the plaintiff is only required to allege that the libelous words were spoken 'of and concerning the plaintiff.' This is an issuable fact, as was the *colloquium* under the former system, and if denied, must be established at the trial. If the words used are not libelous in themselves, or if they have some occult meaning or local signification, and require proof to determine their meaning or to show that they are libelous, or if they are words in a foreign language, it is necessary to make such allegation of their meaning as will show them to be actionable, and by averment 'to ascertain that to the court which is generally or doubtfully expressed.' (*Van Vechten* v. *Hopkins,* 5 Johns. 220.)    'The statute dispenses with them (that is, the *colloquium* and *innuendo*) only so far as they show that the defamatory words applied to the plaintiff, and goes no further. The averments necessary in common-law pleading to show *the meaning of the words* must still be made.' ''

The language from *Harris* v. *Zanone,* set out above, was quoted with approval by this court in *Paxton* v. *Woodward,* 31 Mont. 195, 209, 107 Am. St. Rep. 416, 3 Ann. Cas. 546, 78 Pac. 215.  In that case, however, the point under consideration had to do with a determination of whether the language used was libelous *per se.*

Bearing in mind the definitions of ''inducement'' and *''colloquium,''* given at the beginning of this discussion, it is readily to be observed that all the extrinsic facts which plaintiff would be required to establish at the trial to show the application of the defamatory article to him are embraced within these terms. Therefore the language of *Harris* v.

*Zanone,* quoted in *Paxton* v. *Woodward, supra,* "by this provision the inducement and *colloquium* are dispensed with, and if the words charged are libelous in themselves, the plaintiff is only required to allege that the libelous words were spoken 'of and concerning the plaintiff,' " is decisive of this case.

The judgment is reversed and the cause remanded to the district court of Hill county, with directions to overrule the demurrers.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, HOLLOWAY and GALEN concur.

Rehearing denied July 9, 1923.