[Civil No. 3517. Filed June 17, 1935.]

[46 Pac. (2d) 126.]

CENTRAL ARIZONA LIGHT & POWER COMPANY, a Corporation, Appellant, v. HARLOW H. AKERS, Appellee.

528

Messrs. Armstrong, Kramer, Morrison & Roche, for Appellant.

Mr. W. L. Barnum and Mr. O. B. DeCamp, for Appellee.

ROSS, J.—The plaintiff, Harlow H. Akers, brought this action against the Arizona Publishing Company, owner of the "Arizona Republic" and "Phoenix Gazette," daily newspapers published in Phoenix and circulated throughout the state, and against A. F. Morairty, Dell Perry, Ted Coe and the Central Arizona Light & Power Company, the owner of the utility that furnishes light, power and gas to the people of Phoenix and surrounding country, for damages to his reputation as a lawyer and citizen in publishing and causing to be published on August 5, 1933, in each of said newspapers, as a paid advertisement, the following article, to wit:

"The Anti-Utility 'Racket'

"(1) Handbills and sheets attacking this company and advocating municipal ownership have been circulated in Phoenix. An article based on a fictitious telegram appeared in a recent issue. This article attempted to represent that this company had embroiled itself in state politics. The lies were manufactured in great detail to give the appearance of truth. Not a single material statement in the article was true. Running throughout these attacks is the advocacy of municipal ownership.

"(2) There has been printed a photostatic copy of a contract evidencing that certain Phoenix men are to receive 25% commission from a California concern if they succeed in financing a municipal elec-

tric plant or distribution system in Phoenix. It bears the signature of the interested men. Under these conditions it is not surprising that they are shouting for municipal ownership.

"(3) We are aware that certain concerns are endeavoring to embroil our city in a financing scheme for municipal ownership whereby their local representatives would receive a fat commission. These representatives are trying to inflame public opinion against the utility.

"(4) False and misleading statements through dodgers, occasionally published sheets and soapbox orations are easily made by irresponsible people who are actuated by motives of personal gain at the public's expense and who have everything to gain with nothing to lose.

"(5) Every statement this company makes must be *a fact* because our property is cemented and anchored to the ground and we are a permanent citizen of Phoenix with large property interests.

"CENTRAL ARIZONA LIGHT AND POWER COMPANY."

It is alleged that said article is false, libelous, malicious and defamatory, and was published or caused to be published by defendants of and concerning plaintiff through evil motive, malice and ill will, with intent to injure, disgrace, and defame plaintiff and to bring him into public discredit as a lawyer and as a man and to cause the public to hold plaintiff in contempt and ridicule. The construction or explanation of the alleged libelous writing by the plaintiff, as set forth in the complaint, was:

(1) "That the phrase, 'The Anti-Utility "Racket," ' " appearing as the headline to the above article quoted and especially the word 'Racket' appearing in quotation marks in said article above quoted, is a word, which was at the time of said publication known and understood to mean, an organized activity of the criminal underworld, of persons engaged in the occupation of making money illegitimately by extortion and other illegitimate means, and is an opprobrious

epithet to be applied to a law-abiding citizen; that at the time and place of said publication it was intended by said defendants and was understood by the ordinary reading public that the word 'Racket' meant a gang or an organization engaged in the occupation of making money through illegitimate and unlawful means; that said word 'Racket' in the sense and meaning above defined and published had been, prior to said publication, widely used in many of the newspapers throughout the United States of America, and was a familiar word to the ordinary reading public and readers of the newspapers, and was intended by the said defendants and each of them, to describe a person belonging to a gang or organization engaged in the occupation of making money illegitimately, of criminal activity, extortion and other criminal practices, and was so understood by numerous persons reading said newspapers, and the defendants meant thereby and did charge this plaintiff with being a member of an organization or gang connected with the criminal world, engaged in criminal activities, connected with those whose occupation was to make money illegitimately by extortion and other unlawful means.''

(2) That, defendant in subdivision 2 of the alleged libelous writing intended to say and intended that the reading public should so understand that plaintiff had a contract, a photostatic copy of which had been published on June 2, 1933, in ''Arizona Fax,'' a Phoenix newspaper, under the terms of which plaintiff was to collect 25 per cent. of the sale price of defendants' power plant, if successful in financing a municipal plant or distribution system in Phoenix, and that such commission was excessive, and that plaintiff was connected with a ''racket'' or scheme to secure excessive commissions and profits in connection therewith.

(3) That in subdivision 3 of said article defendant charged plaintiff with being a member of an illegal gang called a ''racket'' and as such member was to

"receive a fat commission," meaning thereby an excessive and illegitimate amount for the services rendered, and was a member of said gang or "racket" endeavoring to inflame public opinion against defendants.

(4) That defendants in subdivision 4 of said article intended to charge, and that the public so understood, that plaintiff was a member of a gang or "racket" issuing false and misleading statements to the public, actuated by wrongful and unlawful motives of personal gain at public expense, meaning that plaintiff was attempting to make money by illegitimate means, extorting the same from the public.

(5) That defendants in subdivision 5 used the words "a fact" in the contrastive sense as showing defendants' statements were true and reliable, whereas plaintiff was engaged in a "racket" endeavoring by unlawful means to extort money from the citizens and taxpayers of Phoenix, and was so understood by the readers of the "Arizona Republic" and "Phoenix Gazette."

The allegations of damages are as follows:

" . . . plaintiff has been and is greatly injured and prejudiced in his capacity as aforesaid and has lost and been deprived of great gains and profits which would otherwise *would* have arisen and accrued to him in his said business and profession, the said publication being made by the defendants through ill-will and malice towards this plaintiff and with the intent, design and purpose on the part of the said defendants to injure this plaintiff in his professional standing and reputation, and to discredit and defame this plaintiff and to bring plaintiff into public discredit as an attorney-at-law and did bring him into public contempt and ridicule to his actual damage in the sum of twenty-five thousand ($25,000.00) dollars and by reason of malice on the part of the defendants in the publication and circulating of said article aforesaid, plaintiff is entitled to exemplary and punitive

damages in the sum of fifty thousand ($50,000.00) dollars.''

The defendants other than the Central Arizona Light & Power Company were dismissed by motion of plaintiff before the trial. The Central Arizona Light & Power Company, to which we shall hereafter refer as defendant, in its amended answer demurred to the complaint for insufficient facts to constitute a cause of action; admitted it caused the publication of the article as alleged; averred that the things stated in the advertisement were true; that they were published so that the users of electricity and gas might be informed or advised that the plaintiff, who was then seeking the Democratic nomination for Congress from Arizona, was publicly and privately advocating a municipal light and power plant for Phoenix, and that at the time he had a contract with the Municipal Engineering & Construction Corporation, a California concern, by the terms of which he and other residents of Phoenix were to receive a commission of 25 per cent. if successful in causing the said California concern to finance said public utility for Phoenix; that such commission would ultimately come out of the consumers of gas and electricity and defendant thought it proper and right to inform them of plaintiff's contract; and that it did so solely for the public good. Defendant denied that subdivisions 1 and 4 of the advertisement were concerning plaintiff, and alleged that 2 and 3 were concerning him and his associates and the commission contract therein mentioned.

Defendant denied generally all the allegations of the complaint, except those expressly admitted.

The demurrer was overruled and the case went to trial before the court and a jury. The court held that the innuendoes in plaintiff's complaint were surplusage and that the article was libelous *per se*.

The jury returned a verdict in favor of the plaintiff in the sum of $10,000 for actual damages and $15,000 for punitive damages.

Defendant has appealed, assigning twenty-seven errors, which it has reduced to twenty-five legal propositions. Many of the questions raised are clearly without any merit, and these we shall not consider. Some of them raise very serious legal problems to which our attention will be given. The first of these is the order of the court overruling the general demurrer to the complaint.

The defendant urges several reasons why the demurrer should have been sustained. An inspection of the alleged libelous article fails to disclose the persons or concerns against whom it was directed. The complaint alleges the article was published ''of and concerning the plaintiff.'' Defendant contends that this is not enough. A complaint at common law for libel, when the alleged libelous writing did not show upon its face its applicability to the plaintiff, in order to state a cause of action was required to set forth extrinsic facts and circumstances (called inducements and colloquium) to show the writing was concerning plaintiff, and, if the language employed was not plainly and clearly libelous *per se,* it was necessary to show by innuendoes its defamatory character. Newell, Slander and Libel, 4th ed., §§ 529–543. This common-law rule of pleading has been modified or altered by statute in many of the states, wherein the inducement and the colloquium are dispensed with. We have such a statute. It reads:

''In an action for libel or slander, the complaint need not state the extrinsic facts applying to the plaintiff the defamatory matter out of which the cause of action arose; but may allege generally that the same was published or spoken concerning the plaintiff, and if such allegation be controverted the

plaintiff shall establish on the trial that it was so published or spoken." Section 3750, Rev. Code 1928.

Under this statute it was sufficient to allege that the article was published of and concerning the plaintiff. It will be seen that such allegation is of an issuable fact and when controverted must be established by the plaintiff on the trial. Newell, Slander and Libel, 4th ed., § 509; *Nolan* v. *Standard Pub. Co.,* 67 Mont. 212, 216 Pac. 571; *Craig* v. *Pueblo Press Pub. Co.,* 5 Colo. App. 208, 37 Pac. 945; *Palmerlee* v. *Nottage,* 119 Minn. 351, 138 N. W. 312, 42 L. R. A. (N. S.) 870; *Sheibley* v. *Huse,* 75 Neb. 811, 106 N. W. 1028, 13 Ann. Cas. 376; *Tilles* v. *Pulitzer Pub. Co.,* 241 Mo. 609, 145 S. W. 1143.

Defendant further contends that the complaint contains insufficient facts, because the advertisement is not libelous either *per se* or *per quod.* This, of course, is the crux of the case. If we assume, as we must in passing on the demurrer, that the advertisement was directed at the plaintiff, the question is: Was the language used therein defamatory?

"Libel" is classified under our law as a crime and as such is defined as follows:

"A libel is any malicious falsehood expressed by writing, printing, or by signs or pictures, which tends to bring any person into disrepute, contempt or ridicule, or to blacken the memory of one who is dead; or any malicious defamation expressed by writing, printing, or by signs or pictures, which tends to impeach the honesty, integrity, virtue or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule. Libel is punishable by a fine not exceeding five thousand dollars or imprisonment in the state prison not exceeding one year." Section 4617, Rev. Code 1928.

The civil action of libel for damages is not defined by our laws. We must, therefore, either ac-

cept the above definition as applicable to civil actions or seek such definition in the common law. As these definitions are not very different, we shall take as our guide what our legislature has said constitutes libel. For a precedent for so doing, see *Shaw Cleaners & Dyers* v. *Des Moines Dress Club,* 215 Iowa 1130, 245 N. W. 231, 86 A. L. R. 839; *Sotham* v. *Drovers Telegram Co.,* 239 Mo. 606, 144 S. W. 428; 36 C. J. 1145, § 3. Under the above definition, if the advertisement "tends to bring any person into disrepute, contempt, or ridicule, or . . . to impeach his honesty, integrity, virtue or reputation," and is false and defamatory, it constitutes a libel on him. Every publication falling within the statutory definition of libel is actionable *per se,* and upon proof of publication the law presumes its falsity and that it was published with malice. The inquiry is: Was plaintiff's good name affected in any of the respects mentioned? If the language charged to be libelous is unambiguous, it is the function of the court to say whether it is libelous *per se.* If it is ambiguous or susceptible of more than one interpretation, it is the province of the jury, under proper instructions from the court, to determine whether it is defamatory. *Springer* v. *Swift,* 59 S. D. 208, 239 N. W. 171, 78 A. L. R. 1171, 1180.

In determining whether the advertisement is libelous *per se,* we look to the language alone. We cannot consider the innuendoes pleaded by plaintiff. Words that are libelous *per se* do not need an innuendo because they are libelous in and of themselves. Words that need an innuendo are not libelous *per se.* 36 C. J. 1151, § 17.

"It is the office of an innuendo to define the defamatory meaning which the plaintiff sets on the words; to show how they come to have that defamatory meaning; and also to show how they relate to the plaintiff, whenever that is not clear on the face of them. But an innuendo may not introduce new

matter, or enlarge the natural meaning of words. It must not put upon the defendant's words a construction which they will not bear. It cannot alter or extend the sense of the words, or make that certain which is in fact uncertain. . . . '' Odgers on Libel and Slander, 6th ed., p. 99.

We therefore consider the language of the advertisement, stripped of the innuendoes, in determining whether it is libelous *per se*. One of the best statements of the rules to be observed in determining if an alleged libel is defamatory is found in *Bettner* v. *Holt,* 70 Cal. 270, 11 Pac. 713, 715:

"In the interpretation to be placed upon language charging the publication of a libel, a court of justice is to put such construction upon the words which it contains as may be derived 'as well from the expressions used as from the whole scope and apparent object of the writer.' *Spencer* v. *Southwick,* 11 Johns. [(N. Y.) 573] 592; *Cooper* v. *Greeley,* 1 Denio [(N. Y.) 347] 358. And not only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning, under all the circumstances attending the publication, which such language may fairly be presumed to have conveyed to those to whom it was published; so that in such cases the language is uniformly to be regarded with what has been its effect, actual or presumed, and its sense is to be arrived at with the help of the cause and occasion of its publication. And in passing upon the sufficiency of such language as stating a cause of action, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of a complaint for libelous publication according to its natural and popular construction. Townsh. Sland. § 133.''

With these rules in mind, we examine the alleged defamatory matter with a view of determining wherein and how the same is libelous.

As we understand the plaintiff, he claims the advertisement is unambiguous, susceptible of but

one meaning, and that defamatory. He says in his brief:

" . . . in the case at bar plaintiff is charged with being a member of a racket or gang for the purpose of destroying the defendant corporation, and bilking the public at the same time, which would amount to nothing more than being in a conspiracy and of course this is doing something which cannot lawfully and properly be done."

If the advertisement is ambiguous or capable of more than one interpretation, it is because of the word "racket" in the headline. It is admitted this word has a sinister meaning with which the general public is familiar. Its meaning is given in Webster's New International Dictionary (1935 Edition), as follows:

"5. *Slang*. a A dodge or trick; a fraudulent scheme, game, or the like; an imposture; as, to work a *racket*. b Specif., a system of obtaining money or other advantage fraudulently or undeservedly, usually with the outward consent of the victims; as, the fortune-telling *racket;* the alimony *racket. Slang.*"

It will be noted that this definition is characterized as *slang,* and it is well known to be of recent origin. We know, and it is a matter of common knowledge in this community, and we think throughout the United States, that the word "racket" is often oddly and innocently used to describe one's vocation or business or diversion; as, for instance, the football racket, the baseball racket, the comic strip racket, the hairdressing racket, the prize-fight racket, without meaning or intending any opprobrious or defamatory reflection, and that the general public not only knows this but is guilty of using the very same kind of slang.

The rule is that a headline and the item of which it is a part are to be considered as one instrument in

determining the effect of an article complained of as being defamatory. See annotation to *Norfolk Post Corp.* v. *Wright,* 140 Va. 735, 125 S. E. 656, 40 A. L. R. 579, at page 583. The headline to the advertisement does not purport to give a synopsis of the advertisement. It affirms nothing, but is used only to attract attention. It is quite apparent that the author of the advertisement did not want to be understood as using the word ''racket'' in any of its usual or conventional senses, and we think it equally obvious that it did not wish to be understood as meaning plaintiff was identified with any organized gang for the purpose of *holding up* industry or business for tribute. We say this because a fair construction of the advertisement shows that the word ''racket'' was not used in a sinister or opprobrious way. Looking to the body of the article, there is therein nothing accusing or pretending to accuse the ''antis,'' or those against private ownership, of demanding tribute from the defendant, the owner of the Phoenix public utility, for protection against extortion or the installation in Phoenix of a municipal utility in competition with defendant. It is simply a *résumé* of the things the advocates of public ownership of utilities had been doing to influence the public to think and act in their way.

It is the connection in which the word ''racket'' is used that determines whether its meaning is innocent or defamatory. Because of its various meanings, both dictionary and slang, in and of itself, the word conveys no definite or certain meaning. We must look to the context of which it is a part to find out what it means.

''Words may have different meanings according to the connection in which they are used, and their context may confine them to but a single and innocent construction. It would be a dangerous doctrine, and

540

tend to promote grave injustice, to permit words to be withdrawn from others with which they are connected and used by the publisher, and then impute to them a meaning not warranted by the whole publication.'' *Flaks* v. *Clarke*, 143 Md. 377, 122 Atl. 383, 385.

If the word ''racket'' were used in a headline to an advertisement or article discussing racketeers and racketeering, and the criminal activities of such persons, its meaning certainly would be defamatory. But if used in a headline to an advertisement by a public utility, such as defendant, in a controversy over private and public ownership, in which no intimation of criminal acts or conduct is manifest, it would not be defamatory. We say this much about the word ''racket'' because of the contention of plaintiff, as heretofore set out, and because of a ruling of the court, hereinafter discussed.

We think the advertisement as a whole is libelous *per se.* It does not charge plaintiff with being a member of a criminal gang or organization engaged in extorting money from business or industry or from the defendant, nor does it impute to him any crime; but it seems to us that the things the body of the advertisement insinuates plaintiff, with others, is guilty of doing to secure favorable opinion for public ownership of the defendant's plant—as, that he published a fictitious telegram, manufactured lies, that his interest was to get a fat commission, that he was trying to inflame public opinion against the utility, and that he was irresponsible and could make false statements, through dodgers, occasionally published sheets, and soap-box orations, for personal gain, and with no chance to lose anything—had a tendency to impeach the honesty and integrity of plaintiff and to bring him into disrepute and was therefore libelous *per se.*

 Having determined that the advertisement is libelous *per se,* the defendant's further contention that the complaint does not state facts sufficient to constitute a cause of action, for the reason that it does not allege special damages, falls to the ground. It is not necessary to either allege or prove special damages when the publication is libelous *per se.* 36 C. J. 1151, § 17. The defendant cites a long list of cases and quotes from some of them quite extensively to the effect that, if the defamatory matter is not libelous *per se,* special damages must be alleged and proved. These cases have no application where the libel is such *per se.*

The complaint, we conclude, states a cause of action for damages for libel.

 During the course of the trial the court, on its own motion, ruled that the advertisement was libelous *per se* and that the innuendoes should be treated as surplusage. This ruling, we think, was legally correct. *Arizona Publishing Co.* v. *Harris,* 20 Ariz. 446, 181 Pac. 373. As reasons for such ruling the court stated:

" . . . especially the use of the word 'racket' in quotations, which indicates that the language was not intended as one originated by the publisher himself, but that it was an adaptation of the word used by others which the Court is of the opinion has acquired such usage in America that it is definite and certain and does in its ordinary usage impute a criminal act or motive, that the Court holds that although the word has likewise an innocent meaning, as shown by counsel yesterday as having three or four different meanings, that the Court will hold that the words are *prima facie* actionable and will treat the innuendo as surplusage, but will permit the defense under its pleadings, which are amply broad for it to do so, to show that it in fact intended to ascribe to the word an innocent meaning. We will proceed upon that ground."

This ruling is complained of as erroneous for several reasons, one of which we notice; the others being without merit or already disposed of. It is said the meaning the court gave to the word "racket" is impossible when it is read in connection with the entire advertisement. The court's statement of the grounds for its ruling is that the word "racket" "has acquired such usage in America that it is definite and certain and does in its ordinary usage impute a criminal act or motive." As we have heretofore seen, the word "racket" in the connection in which it is used in the advertisement clearly does not impute to plaintiff any criminal act or motive but on the contrary is governed and controlled in its meaning entirely by the body of the advertisement, which is only a statement of the controversy between advocates of public and private ownership of utilities, with an enumeration of the tactics of the advocates of public ownership, none of which tactics is criminal. When this ruling was made, the complaint and the innuendoes had been read to the jury giving plaintiff's interpretation of the word "racket," and when the court said "its ordinary usage imputes a criminal act or motive," the jury naturally visioned "an organized activity of the criminal underworld, of persons engaged in the occupation of making money illegitimately by extortion and other illegitimate means," and that plaintiff was a member of such organization or gang, engaged in criminal activities. While the ruling was correct, the language used by the court, to the effect that the word "racket" meant a criminal act or motive, was certainly calculated to mislead the jury into believing that the defendant, according to the court's opinion, had charged plaintiff with being a member of a criminal gang organized for criminal purposes. This thought was left with the jury throughout the

trial, as is shown by the court's instructions to that body. One of such instructions, to which exception is taken, reads:

"You are instructed, gentlemen of the jury, that the use of the word 'racket' in the title of said advertisement, construed in connection with the advertisement itself, is actionable *per se*. . . . "

The placing of all emphasis and stress on the word "racket," whereas the sting was in the body of the advertisement, was not only erroneous but had the evil effect of impressing the jury that the defendant had imputed a serious crime or criminal motive to plaintiff.

But a more serious question is one complaining of the court's denial of defendant's motion for an instructed verdict at the conclusion of all the evidence, on the ground that the proof without contradiction showed that the advertisement and every part of it was true. The defendant's answer asserts that the advertisement is true. Under the law this is a good defense and if established exempts the defendant from civil liability, whether the words are actionable *per se* or *per quod*. 36 C. J. 1231, § 193.

We will take up the subdivisions of the advertisement, in the order in which they are numbered, and call attention to what each subdivision states, and we will examine the evidence to determine if what is stated is true.

Taking subdivision 1, first. The evidence is uncontradicted that handbills and sheets (newspapers) attacking defendant, and advocating municipal ownership of public utilities, had been circulated in Phoenix; that the "Arizona Beacon," a newspaper published and circulated in Phoenix, in its issue of July 7, 1933, published an article headed:

"Power Trust Starts Recall on Gov. Moeur. Petitions Placed in Circulation Soon as Aller Reaches

City. Undercoverman's (*sic*) Telegram Demanding Additional $6,000 Brings Executive from Douglas by Plane.''

Excerpts from this article are:

''The pernicious hand of the power trust has come out in the open in an effort to defeat the policies of the Arizona Beacon in its effort to obtain a reduction in the electric light and power rates for the people of Phoenix and vicinity. Governor B. B. Moeur is openly pledged to demand a proper downward revision of these rates through the state corporation commission and his appointee, John Cummard, is pledged to just this.

''So the magnanimous power trust has decreed that Governor Moeur must be retired before he can obtain control of this all-powerful state board. As a result they started circulation of the petitions yesterday demanding the recall of Governor Moeur. Announcement that these petitions had been put in circulation appeared yesterday morning in the city's daily news monopoly.

''Almost simultaneous with the appearance of these petitions, Howard Aller, of the power trust arrived in Phoenix by airplane, coming from Douglas, where he had been supervising the campaign from a distance, upon receipt of a telegram from one of the trust's under covermen (*sic*), Dell Perry.

''Perry telegraphed him to the effect that he needed $6,000 immediately in order to 'complete policies outlined by you.' So Aller jumped an airplane to see just what the $6,000 would do.''

''And so the power trust was asked to add $6,000 to the funds already expended in its effort to have the admittedly exorbitant power rates continued in effect. The trust's under coverman (*sic*) needed money badly and quickly, and so he dispatched the telegram to Mr. Aller. This message, dated July 5 was sent to Douglas in ample time for Aller, the trust representative to reach Phoenix that afternoon by airplane. Aller opened offices in the comfortable air-cooled Hotel Westward Ho, and activities in the trust's campaign to defeat the interests of the people are now being directed from there.''

"For more than a day there was an almost constant stream of visitors to Mr. Aller's suite, and as a result the petitions appeared in many of the city's residential districts. Women were asked to sign them under various subterfuges."

The evidence is absolute that all of the above-quoted matters were false and that the telegram therein mentioned was fictitious.

Subdivision 2. The proof was that plaintiff and one O. B. De Camp had a contract with the Municipal Engineering & Construction Corporation, a California concern, by the terms of which the said concern agreed to pay plaintiff and De Camp, for brokerage services, 25 per cent. of any amount received by the concern as a result of any contract with any municipality in Arizona by which said municipality should purchase a public utility. This contract was admitted by plaintiff. It had been theretofore, and on June 2d, published in "Arizona Fax," a publication printed and circulated in Phoenix, and persons who had seen that issue of "Fax," upon reading the advertisement, knew the reference to the copy of photostatic contract referred to plaintiff.

Subdivision 3, after stating that "certain concerns are endeavoring to embroil our city in a financing scheme for municipal ownership whereby their local representatives would receive a fat commission," stated that these representatives, meaning plaintiff and De Camp, were "trying to inflame public opinion against the utility." It is undisputed that plaintiff was advocating public ownership of Phoenix utilities both privately and publicly; carried an advertisement in the "Arizona Beacon" of July 7, 1933, advocating public ownership. The reference to his compensation as being a "fat commission" is but stating a fact.

Subdivision 4, we take it, is a general summary of what precedes and is but a fair and reasonable comment.

By no stretch of the imagination is it possible to construe or interpret subdivision 5 as opprobrious or defamatory.

In the earlier part of this opinion we stated that the complaint was sufficient if it alleged that the defamatory matter was published of and concerning plaintiff, but that if defendant put such allegation into issue it was incumbent upon plaintiff to prove that it was published concerning the plaintiff. The evidence is undisputed and uncontradicted that the matter contained in subdivision 1 had no reference whatever to the plaintiff, but alluded to handbills distributed by others and to sheets publishing articles such as the one of July 7th in the "Arizona Beacon." Defendant admitted in its answer that subdivisions 2 and 3 were intended to apply to plaintiff, and plaintiff does not deny, but on the contrary admits, that the contract with the "California concern," described therein, was an existing instrument. Defendant's answer denied that the matter contained in subdivision 4 of the advertisement was concerning plaintiff, and the testimony supports that denial. In other words, plaintiff failed to show that it was concerning himself.

Instead of directing a verdict on defendant's motion, the court submitted the question of the truth of the advertisement to the jury, and the plaintiff contends that this was all the defendant was entitled to. Had there been any material conflict in the evidence as to the truth of the advertisement, it would have been proper to submit the issue to the jury. Where, however, the evidence on any given issue is all one way and is either admitted or not questioned or disputed, and is susceptible of but one inference, the issue should

not be submitted to the jury but should be decided by the court. It is said in 17 Ruling Case Law, 423, section 182:

"In actions for damages for libel or slander, as in other civil actions, it is the well settled general rule that it is the province of the court to state the law and that of the jury to determine the facts. Where different conclusions may reasonably be drawn by different minds from the same evidence, the question, ordinarily, is one for the jury. But where the facts are wholly undisputed and admit of no conflicting inferences, the question is one of law."

We do not find it necessary to pass upon all the assignments, since the ones we have considered require that the judgment be reversed and the cause remanded for a new trial. If the other assigned errors possess any merit, we think, in view of our discussion of the case as a whole, that the errors will not be repeated and for that reason do not discuss them. Many of them possess no merit.

The judgment is reversed and the cause remanded, with directions that further proceedings be had in accordance herewith.

LOCKWOOD, C. J., and McALISTER, J., concur.