[Civil No. 3988.   Filed July 5, 1938.]

[80 Pac. (2d) 964.]

J. J. KINSEY, Appellant, v. THE REAL DETECTIVE PUBLISHING CO., INC., a Corporation, THE AMERICAN NEWS COMPANY OF ARIZONA, a Corporation, THE AMERICAN NEWS COMPANY, INC., a Corporation, and CECIL NEWMARK, Appellees.

354

Mr. V. L. Hash, for Appellant.

Mr. Lynn M. Laney and Mr. Grant Laney, for Appellees.

LOCKWOOD, J.—J. J. Kinsey, hereinafter called plaintiff, brought suit for libel against The Real Detective Publishing Co., Inc., a corporation, The American News Company of Arizona, a corporation, The American News Company, Inc., a corporation, and Cecil Newmark, hereinafter called defendants. The Real Detective Publishing Co., Inc., entered a special appearance, objecting to the jurisdiction of the court, which objection was sustained. Thereafter the other parties defendant appeared and filed various motions, among them being one to make the complaint more definite and certain, on the ground that it set forth only excerpts from the alleged libelous article, and that the precise nature of the plaintiff's cause of action was not apparent therefrom, so that the defendant could

either demur or answer in such manner as to enable the court to determine whether the article was libelous. This motion was granted, and an amended complaint was filed, setting up the whole of the article. Defendants demurred thereto, on the ground that the amended complaint did not state a cause of action, which demurrer was sustained, and, plaintiff electing to stand upon his complaint, judgment was entered in favor of the defendants, whereupon this appeal was taken.

There are but two points for our consideration. The first is whether or not the court erred in sustaining the motion to make the first complaint more definite and certain, and the second whether the amended complaint stated a cause of action in libel as against the defendants. The action was based upon an article published in a magazine called "Real Detective" which discussed a criminal case well known in Phoenix and the vicinity. The article is too long to be set forth in full in this opinion, but its substance was that there existed in Arizona an abortion ring, which covered practically the entire state, and which was particularly active in the city of Phoenix. It then set up in lurid details the alleged facts in regard to a criminal abortion performed by a woman named Billie Kinsey, the former wife of the plaintiff, and that she was convicted by a jury of murder in the second degree for the abortion. The article brought plaintiff into the case with the following language:

"Nude except for silk stockings which moulded two comely legs, and a garment draped across slender, young womanhood laying dying in a Phoenix, Arizona hospital. . . .

"It was deathly quiet outside on the desert, where the waste stretches, buried in the pitchy darkness, now seemed like a ghastly tomb, and the gnarled cacti looked like demons from an unknown inferno.

"It was from out of that tomb a few minutes before that three men had stolen, bearing the blood-stained

body of an unconscious girl.  Their faces, the nurses later remembered, were distorted with terror.

"After depositing their limp burden they vanished again into the desert.  The nurse on duty at the desk hurried after them, wanting their names for her records, but they had fled too swiftly.

"They, or some one, had tried to dress the girl. . . . "

Then followed a most sensational discussion of theories, alleged facts and comments thereon in regard to the case, and the search of the officers for those responsible for the situation.  It continued:

"They had almost given up the hunt, when they came across a young man of twenty-five or so, who rather reluctantly admitted that he might know something. . . .

"His story was that he and a friend were drinking at the Grand Avenue place, when a strange man rushed in and asked them to help him move an injured girl to a hospital.  He and his friend had gone willingly. . . .

"His friend was found and he too, told the same story, almost word for word.  Officers decided that the narrative needed considerable *expending* and they took the two into custody for further questioning. Their names were Charles Ackels and Calvert Lewallen.  They both had reputations as hard working young men and neither had ever been involved in trouble. . . .

"It was the third day when the case began to break fast.  Realizing that they were first class suspects, Ackels and Lewallen starting placing together a few facts that might clear themselves and substantiate their story of being innocent bystanders.  Out of the long cross examination, one point stood forth.  They managed to describe the man they had helped, to such an extent that he was easily identified by the hangers-on at the Grand Avenue beer parlor as J. J. Kinsey, better known as 'Jap'. . . .

"Deputies Louis Rodgers and Ernest Roach had already left the court house to scour the city for

'Jap' Kinsey, the third man in the hospital enigma and possibly the connecting link between the House of Horror and the hospital. Going to the Far West Touring Court, where it was reported that he had been living recently, they immediately spotted a 1925 automobile. They located Kinsey in one of the cabins.

"He opened the door readily enough to the officers, but assumed a stoical indifference when he learned they wanted him to accompany them to the sheriff's office. . . .

"Arriving at headquarters, 'Jap' Kinsey said he wanted 'to come clean' about everything, but his story only admitted that he had taken Odessa Ball to the hospital after his wife, Billie Kinsey—the 'lady in white'—had appealed to him to help her. They hadn't been living together for some time, he said, and he knew nothing about her nursing home. Like the others, he, too, posed as only a Good Samaritan who had dashed to the rescue of a girl in need. . . .

"Sheriff McFadden believed the first three Samaritans—Charles Ackels, Calvert Lewallen and 'Jap' Kinsey—and they were exonerated of any blame in connection with the House of Horror, . . . . "

The article concludes with the statement that Billie Kinsey was convicted of second degree murder.

The original complaint contained only a portion of the article, and entirely omitted the fact that the latter stated specifically that the authorities were of the opinion that plaintiff was not to blame in connection with the matter.

We have stated that under the law of Arizona civil and criminal libel have the same definition. *Central Arizona Light & Power Co.* v. *Akers,* 45 Ariz. 526, 46 Pac. (2d) 126. Section 4617, Revised Code 1928, reads as follows:

"*Libel defined; punishment.* A libel is any malicious falsehood expressed by writing, printing, or by signs or pictures, which tends to bring any person into disrepute, contempt or ridicule, or to blacken the memory of one who is dead; or any malicious defa-

mation expressed by writing, printing, or by signs or pictures, which tends to impeach the honesty, integrity, virtue or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule. . . . ''

Under this definition, if an article published is such that it obviously ''tends to bring any person into disrepute, contempt or ridicule . . . to impeach his honesty, integrity, virtue or reputation'' and is false or defamatory, it is libelous *per se,* and upon proof of publication the law presumes its falsity and that it was published with malicious intent. But, in determining whether an article does have this effect and is, therefore, libelous *per se,* it must be construed as a whole, not only with reference to its exact language, but in accordance with its sense and meaning under all the circumstances surrounding the publication, so that it may be determined as to *what meaning the language used may fairly be presumed to have conveyed to those to whom it was published,* for it well may be that certain words standing alone are, on their face, libelous in the highest degree, while when considered with their context, they are entirely innocent. On the other hand, other phrases, innocent of themselves, when considered in connection with others, may be libelous. We think, therefore, that when it appears that the true effect of a published article on the mind of its reader can only be determined by a perusal of the entire article, defendants in a libel action may require, by a motion to make more definite and certain, that the entire article be set forth in the complaint, for the purpose of determining whether or not it is really libelous. *McClure* v. *Review Pub. Co.,* 38 Wash. 160, 80 Pac. 303. This matter is naturally to a great extent within the discretion of the trial court, and on examining the excerpts from the article, which

were the basis of the original complaint, and the entire article as set forth in the amended complaint, we are of the opinion that the trial court very properly sustained the motion to make more definite and certain.

We then consider whether the amended complaint stated a cause of action. Upon an examination of the article, we think it sets forth a condition of affairs which, if true, pictures a most revolting situation as existing in the city of Phoenix, and we are satisfied that an allegation that any person was a participant in even the slightest degree in the crime described in the article, or that he attempted, even though innocent of any direct connection with the crime, to conceal its perpetration or protect the perpetrator, would in the very highest degree tend to bring him into disrepute, contempt and ridicule, and impeach his honesty, integrity, virtue and reputation. The article specifically alleges that plaintiff did do certain things which would cause the ordinary reader to believe that, even if he were not an accomplice in the crime, there was a strong probability that he was an accessory after the fact, regardless of whether the sheriff believed that he was innocent or guilty. If these statements were false, they were certainly defamatory, and plaintiff alleges in his complaint that they were false. For the purpose of the demurrer, we must assume that his claim in this behalf was correct for, in passing upon a demurrer, all the allegations of the complaint which are well pleaded are presumed to be true. The complaint, therefore, was good as against a general demurrer, and the court erred in overruling it. The question of the truth or falsity of the allegations of the article in regard to plaintiff is a matter for determination on the evidence

presented at the trial, and it may not be assumed, in passing on the demurrer, that they are true.

The judgment of the superior court is reversed, and the case remanded with instructions to overrule the demurrer to the complaint, and for such further proceedings as may be advisable.

McALISTER, C. J., and ROSS, J., concur.