447 P.2d 840

**PHOENIX NEWSPAPERS, INC., a corporation; Eugene C. Pulliam and Michael Padev, Appellants,**

v.

**Wade CHURCH, Appellee.**

No. 8122.

Supreme Court of Arizona.

In Banc.

Nov. 27, 1968.

Rehearing Denied Dec. 24, 1968.

Gust, Rosenfeld & Divelbess, Snell & Wilmer, by Mark Wilmer, Phoenix, for appellants.

Leibsohn, Goldstein & Weeks, by Philip T. Goldstein, Phoenix, for appellee.

LOCKWOOD, Justice:

Appellee Wade Church was Attorney General of the State of Arizona at the time of the commencement of this suit for libel on May 11, 1959. His claim was based upon an alleged libelous editorial which appeared on the front page of the *Arizona Republic*, one of two daily newspapers published by appellant, Phoenix Newspapers, Inc. Appellant Eugene C. Pulliam was, and is, president and publisher of the corporate defendant; appellant Michael Padev was the author of the editorial by which appellee claims he was libeled.

The events preceding the publication of the editorial were the following:

On May 7, 1959, Mr. Church delivered a speech in Flagstaff, Arizona to the delegates of an AFL–CIO convention. The speech was not given from a prepared text but rather from notes; it was tape recorded, later transcribed, and produced in court by the defendants. Some of the pertinent portions of that speech which appear in the record are as follows:

"* * * I want to talk to you a little bit tonight about why labor is in politics in Arizona. I think there is a number of reasons. I think the first reason is because management is dominating the political scene in this state, and they have dominated it since 1912.

\* \* \* \* \* \*

"* * * I think the first problem with reference to politics is the legislative control. Do you know that this legislature is controlled lock, stock and barrel by a third house that is not even elected by the people? They have a representative in the Hotel Adams that coordinates the work of all the special interest groups and you can't get a bill through unless you get their okay, and I am talking about the mining groups, and the power groups, and the construction groups, and the finance groups, and the cattle groups. They are all coordinated, they have a regular *council*, and the astounding thing is that the legislation that is passed is passed and okayed by this group. * * *

"We, the people, what do we have to say about it? * * * Nothing, absolutely nothing. * * * It just makes you wonder whether or not the fundamental structure of our democratic order here in this state is going under, and I believe it is unless we take steps to change that." (Emphasis ours.)

Mr. Church proceeded to cite certain problems which existed in the state, and noted, with regard to a need for equalization of educational opportunities, that

"* * * That bill [a property evaluation bill] was lobbied through the legislature by the representative of the railroad group, it was his job. This *council* selected him to whip that through the legislature, you know. I saw him, he told me. And it is his job now to see

that there is a representative of this unseen government before every County Board of Supervisors to make sure there is not too much money given the schools * * *. But nevertheless there you have a piece of special legislation that demonstrates that our legislature is run by a third house with headquarters in the Hotel Adams. I think it is a disgrace and we are going to have to do something about it. * * *". (Emphasis ours.)

He cited other problems which he thought should be solved by representative legislation and then stated:

"Now, the working people and the people's groups are going to have to do *the same thing.* We are going to have to build a *council.* We are going to have to have *full-time representatives* up there at that legislature. We are going to have to watch it carefully. The *P.T.A.* ought to have them. The *Council of Churches* ought to have them, the labor groups ought to have two or three and those teachers, they are the ones that got a lot of brains, doggone them, they should be out there, too. * * *.

\* \* \* \* \* \*

"But the thing that worries me is this, that if we don't do it, Democracy as we conceive it and as our kids learn it in the schools, will no longer exist in this state. If we don't *match stride for stride* the careful painstaking job that these special interest groups do in presenting their viewpoints to the legislature, *ours and others,* if we don't match that with the *people's council,* we are dead as a dodo and Democracy dies with it. We will bury our Democratic Order. We can't afford any longer in this state to have these special interests running us. * * * If we don't do it, then our children are going to live in a very, very shabby world * * *. If the labor organizations don't spearhead this people's movement for a restoration of the basic democratic principles that our forefathers fought for, no one will do it, and I think once you take the labor movement out of our current system, we are

dead. We are dead. And any hope for *anything other than a totalitarian state* is dead with it. * * *" (Emphasis ours.)

The day following, a news report of the speech appeared in the *Arizona Republic* and in part stated:

### "CHURCH FLAYS LEGISLATURE'S THIRD HOUSE

"FLAGSTAFF (Special)—Atty. Gen. Wade Church last night called for a 'people's council' to offset the special interest 'third house' which rules Arizona from Hotel Adams.

"He urged organized labor to join churches, PTA's, minority groups, and others and hire fulltime personnel to match *lobbyists* with the mines, power groups, construction industry, finance interests, and cattle groups. * * *"

A similar news account was published in the *Phoenix Gazette:*

### "LABOR URGED TO COMBAT 'THIRD HOUSE'

By Bruce Kipp, Gazette Staff Writer

"FLAGSTAFF, May 7—Atty. Gen. Wade Church advocates the creation of a 'people's council' to offset the effects of a 'third house' of the legislature through which, he says, management dominates the lawmaking in Arizona.

\* \* \* \* \* \*

"Toting up a list of people's needs, which included his people's council and a second major newspaper for Phoenix, Church said 'if labor won't spearhead this movement, nobody will do it.'

\* \* \* \* \* \*

"We're going to do exactly what these boys are doing—hire our own representatives to this people's council to counteract the lobbyists of the mines, railroads, and utilities which, in turn, control the state. * * *."

Subsequently, on May 11, 1959 an editorial, prominently placed on the front page, rather than on the editorial pages, appeared in the *Arizona Republic.* This editorial,

the subject of plaintiff's suit for libel, states the following:

"An Editorial

"COMMUNISM AND MR. CHURCH

"NOTHING ILLUSTRATES better the dangerous left-wing ideas of Attorney General Wade Church than his proposals for the setting up of a 'people's council' in Arizona.

"According to Church our legislature is 'dominated' by special interest groups operating from the Adams Hotel in Phoenix. For this reason the legislature does not reflect the will of the majority of the people, the attorney general argues. To 'correct' this situation Mr. Church proposes the selection of a 'people's council' which presumably, should tell the legislature what to do and how to do it. Mr. Church thinks that this 'people's council' should be organized and run by Arizona's labor unions.

"MR. CHURCH'S 'people's council' idea comes straight from the writings of Karl Marx, the god of 'scientific socialism' and the prophet of the international Communist movement. The same idea was the cornerstone of the philosophy of Lenin, the founder of the Soviet state. The same idea is the political basis of all Communist regimes all over the world. The story of communism in power is essentially a story of the 'people's council' idea of government put into practice.

"When the Russian Czarist government fell apart early in 1917, the Russian democratic parties, which enjoyed the overwhelming support of the Russian people, formed democratically elected government organizations, including a central (federal) government responsible to an assembly (parliament).

"Later on the Russians elected a constituent assembly.

"In all these elected bodies the Communists had but a tiny and insignificant minority.

"But the Communists were not interested in votes—they never are. They were, as they are, interested in power alone.

"THE COMMUNIST PARTY, under Lenin, created its own 'people's councils' which functioned independently of the government just the way Wade Church wants the Arizona 'people's council' to function.

"These Russian 'people's councils' were supposed to consist of 'soldiers and sailors' and 'workers and peasants,' but were, in fact, dominated and manipulated by the Communists.

"It was these councils that played the most decisive role in the overthrow of the Russian national all-party government headed by the social democratic leader, Kerensky.

"It was these 'people's councils' that completed the destruction of the Russian 'bourgeois' (capitalist) state and imposed the Communist regime. The first Communist cabinet, headed by Lenin, was actually called a people's council of commissars. In Russian the word 'soviet' means 'council' and the Soviet government is quite properly called 'council government.'

"THE COMMUNISTS employed the same 'council' technique in East Europe, as well as in the Far East, including Red China. People's councils, at times called patriotic councils, national councils, anti-Fascist councils, democratic councils, peace councils, and so on, were formed by the Communists everywhere with the sole purpose of 'guiding,' i. e. intimidating, blackmailing, and terrorizing the elected parliaments and district assemblies, which were not, at the beginning, Communist controlled.

"The 'people's council' idea is only another name for the Communist technique of the seizure of power and for the Communist way of enabling a small minority to control and eventually to rule the huge majority.

"According to Communist theoreticians, from Marx and Lenin to Krushchev and Mao, only the 'advance guard' (the Communist leaders) of the 'working class' (the majority of the people) know how to interpret the 'historical laws of development' of our society.

"This supposedly enables the Communist leaders to know best what's good for the rest of us.

"Communists believe that they have the right and the duty 'to guide' the masses of humanity along the 'correct road' leading to socialism. The Communist-controlled 'people's councils' do this 'guidance' work with regard to the state.

" 'THE PEOPLE'S COUNCIL' idea of Attorney General Church is therefore nothing but a disguised Marxist idea of minority rule over the majority.

"We are certain that most Arizonans will resolutely reject Mr. Church's alarming conceptions of government.

"We also sincerely hope that the Arizona labor movement—at whose annual convention last week Mr. Church first voiced his 'people's council' proposals—will have the good sense to disassociate itself completely from such dangerous ideology, which can only do harm to the rank and file working man.

"BUT MR. CHURCH, himself, owes an urgent explanation to the public. He has to state, publicly and clearly, whether or not his 'people's council' proposals are part and parcel of a general Marxist philosophy of government and of life.

"Does Mr. Church advocate socialism for Arizona?

"Does he advocate communism?

"Does he want 'people's councils' to take over our state government in the way they have taken over the governments of all the unhappy lands behind the Communist Iron Curtain?" (Emphasis ours.)

Plaintiff Church immediately filed his complaint for libel against Phoenix Newspapers, Inc., the publisher, Eugene Pulliam, and the editorial writer, Michael Padev, in the Superior Court for Maricopa County. On May 12, defendants published plaintiff's reply to the editorial rejecting the newspaper's "opinions and inferences expressed" regarding his talk. Defendants Pulliam and Phoenix Newspapers, Inc., after unsuccessful motions to dismiss the com-

plaint, filed their answer thereto on May 29, 1961. Plaintiff thereafter was granted leave to amend his complaint, and it is upon the amended complaint, and the subsequent answers of all defendants, that issues were joined. The case came on for trial April 29, 1963, and after a lengthy trial the jury entered a verdict for plaintiff in the sum of $30,000 compensatory damages, and $20,-000 punitive damages. From this verdict and judgment, and from orders denying defendants' motions to set aside the verdict and judgment, and motions for a new trial, defendants appeal. We shall hereafter refer to the parties as they were designated below, as plaintiff and defendants.

Although defendants make numerous assignments of error on this appeal, three principal issues emerge: (1) Whether the court before trial ruled correctly that the editorial was libelous per se; (2) Whether the editorial was qualifiedly privileged, and if so, whether the editorial constituted fair comment; (3) Whether sufficient evidence was adduced to prove both falsity and actual malice. In the light of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) we must also determine whether the verdict and judgment abridge unconstitutionally the freedoms guaranteed by the First Amendment to the United States Constitution.

1.

The first question to be decided is whether the trial court was correct in its ruling before the trial that the editorial was libelous per se. We agree that it was. Defendants vigorously contend that, at most, the editorial is susceptible to two meanings —one libelous, the other nonlibelous; that if anything, the editorial is libelous per quod and as such should have been submitted to the jury for a determination whether the editorial was actionably defamatory. Defendants assert that the editorial was a comment upon a political speech, that such comment was based upon true facts, and that while the editorial does state that the proposed "people's council" is a communist device, nevertheless, the idea, and not the

plaintiff, was the subject of the attack, *ergo,* there is no charge that plaintiff has communist sympathies.

■ The guideline to be followed in determining whether a publication is libelous in and of itself has been previously stated by this Court in Central Arizona Light & Power Co. v. Akers, 45 Ariz. 526, 46 P.2d 126 (1935). In that case it was held:

> In determining whether the [publication] is libelous *per se,* we look to the language alone. * * * Words that are libelous *per se* do not need an innuendo because they are libelous in and of themselves. 45 Ariz. at 536, 46 P.2d at 131 (1935).

And, in Phoenix Newspapers v. Choisser, 82 Ariz. 271, 312 P.2d 150 (1957), it was stated that " * * * the entire article must be considered as a whole. * * * This is true not only with reference to its exact language but in accordance with its sense and meaning under all the circumstances surrounding its publication".

A publication is libelous "if [it] tends to bring any person into disrepute, contempt or ridicule or—to impeach his honesty, integrity, virtue or reputation, and is false and defamatory". Phoenix Newspapers v. Choisser, 82 Ariz. 271, 275, 312 P.2d 150, 153 (1957). And see Broking v. Phoenix Newspapers, 76 Ariz. 334, 337, 264 P.2d 413, 415, 39 A.L.R.2d 1382 (1953).

■ The trial court in the first instance examines the publication for its defamatory

content, and "if the language charged to be libelous is unambiguous it is the function of the court to say whether it is libelous per se". Broking v. Phoenix Newspapers, *supra,* 76 Ariz. at 337, 264 P.2d at 415.

■ Viewing the editorial as a whole, and keeping in mind that

> "What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest." Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649, 655 (1966),

and that

> "[T]he publication is to be measured, not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." MacLeod v. Tribune Publishing Co., 52 Cal.2d 536, 547, 343 P.2d 36, 41 (1959),

we are convinced that the editorial is libelous on its face, i. e., *per se,* and that the trial court was correct in its ruling.[1] Taking the editorial statement for what it actually is, it could not have any other effect than to cause injury to the reputation of a person in Wade Church's position,[2] for it charges that "Mr. Church's 'people's council' idea" is the political basis of all communist regimes and the "cornerstone of the philosophy of Lenin, the founder of the Soviet state," as well as coming

---

1. Defendants devote considerable space in their brief to the proposition that the plaintiff, for his failure to allege "special damages" has drawn a complaint which is insufficient as a matter of law and good pleading. The controversy still rages among commentators and courts as to the relative significance of the legal principles distinguishing libel per se from libel per quod [Compare Eldredge, "The Spurious Rule of Libel Per Quod", 79 Harv.L.Rev. 733 (1965/66), with Prosser, "More Libel Per Quod", 79 Harv. L.Rev. 1629 (1965/66); and see Hinkle v. Alexander, 244 Or. 267, 411 P.2d 829, 417 P.2d 586 (1966): "We are not so much concerned about which of the opposing rules has the actual support of a majority of the courts. Our prime concern is which rule is the better, more workable and less confusing. We conclude that the Restatement rule (§ 569 (1938)) is to be preferred and adhere to it". 244 Or. at 277, 417 P.2d at 589]. In this case, however, the defamatory meaning is within the editorial itself. See Cen. Ariz. L. & P. Co. v. Akers, 45 Ariz. 526, 46 P.2d 126 (1935).

2. Cepeda v. Cowles Magazines & Broadcasting Co., 328 F.2d 869 (9th Cir. 1964) aff'd., 392 F.2d 417 (9th Cir. 1968); Fairbanks Publ. Co. v. Pitka, 376 P.2d 190 (Alaska 1962).

"straight from the writings of Karl Marx, the god of 'scientific socialism' and the prophet of the international Communist movement". It then proceeds to explain in scholarly, clear and unmistakable language how communists employed the people's council technique (already described as "Mr. Church's 'people's council idea'") for the purpose of "'guiding' i. e., intimidating, blackmailing, and terrorizing the elected parliaments and district assemblies" in the process of seizure of power by communists. It plainly states *"The people's council idea of Attorney General Church* is therefore nothing but a disguised Marxist idea of minority rule over the majority". (Emphasis added.)

■ The apparently rhetorical questions at the end of the editorial ask plaintiff to state whether *"his* 'people's council'" proposal (already characterized as a communist device employing the technique of intimidation, blackmail and terrorism) is part and parcel of a *general* Marxist (i. e. communist) philosophy of government and life, and whether he advocates socialism or communism for Arizona, with a desire to have people's councils (characterized as "Mr. Church's" idea) take over the state government in the way they have taken over all unhappy lands behind the Communist Iron Curtain. The insinuation that "Mr. Church's idea," embodies and approves of communist methods of intimidation, blackmail and terror, is so apparent here as to leave no room for argument. "A person may be liable for what he insinuates as well as for what he says explicitly." Cameron v. Wernick, 251 A.C.A. 1025, 60 Cal.Rptr. 102, 104 (1967); MacLeod v. Tribune Publishing Co., supra, 52 Cal.2d at 547, 343 P.2d at 42 (1959). There is respectable, and persuasive authority for the proposition that to charge a person with communist sympathies, leanings, and sentiments, or that such person is a "fellow-traveler", constitutes libel *per se:*

"Whatever the rule may have been when anti-communist sentiment was less crystalized than it is [Citations] it is now settled that a charge of membership in the Communist Party or communist affiliation or sympathy is libelous on its face." MacLeod v. Tribune Publishing Co., 52 Cal.2d at 546, 343 P.2d at 41. And see, 33 A.L.R.2d 1186, 1212 (1954) and cases collected therein.

The whole thrust of the editorial is to link inseparably Wade Church and the idea of a "people's council" to the communist "people's council", thus charging him with espousing a communist doctrine involving intimidation, blackmail and terrorism. This is clearly no less than a charge of being in sympathy with communism in its lawless and violent aspects. The defamatory impression originally left in the minds of the readers of this editorial was thus reinforced by the series of questions at the conclusion of the editorial.

There is probably no quicker, more devastating means for bringing a man into public contempt and hate than to affix to him the label "communist", or to link him otherwise to sympathy with communist ideology in its violent aspects, and this was particularly so in 1959. It is absurd to assert that under such circumstances the editorial, as claimed by the defendants, merely attacked plaintiff's idea, and therefore was completely lacking in any accusation against plaintiff himself. It was basically a statement that plaintiff's attitude, expressed by his idea, was sympathetic with violent communist methods.

As was said in Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (1966):

"Appellant contends that as a matter of law the article is not libelous since Mr. Stone did not flatly state that plaintiff was prejudiced, and because it is not a statement of fact about plaintiff's conduct but a statement of opinion about his attitude. *Where readers would understand a defamatory meaning liability cannot be avoided merely because the publication is cast in the form of an opinion, belief, insinuation or even question.* A statement about one's attitude is defama-

tory if it tends to lower him in the esteem of the community." 366 F.2d at 655 (1966) (Emphasis added.)

Defendants state that in 1959, it was not *unlawful* in Arizona to be a communist or a member of the Communist Party.[3] Though this is true from a purely legal point of view, our discussion hereafter of the issue of malice forecloses the relevance of this argument.

What we have so far stated does not, of course, foreclose the possibility that the judgment cannot stand in light of recent United States Supreme Court decisions dealing with the freedoms guaranteed by the First Amendment. Our inquiry will be directed, therefore, to an examination of the facts and proceedings of the case at bar "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials". New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

The First Amendment to the Constitution of the United States provides in part that "Congress shall make no law * * * abridging the freedom of speech, or * * * the press; * * *". The decision in Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) made the freedoms guaranteed by the First Amendment applicable to the states via the Due Process Clause of the Fourteenth Amendment. And since *Gitlow*, the permissible scope of state action in regulating these freedoms

through legislation or otherwise has been greatly circumscribed by many decisions of the United States Supreme Court. Of controlling importance for the proper disposition of this appeal is the rule announced by the Court in the case of New York Times Co. v. Sullivan, supra. The Court held:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with *'actual malice'* —*that is, with knowledge that it was false or with reckless disregard of whether it was false or not.*" 376 U.S. at 279–280, 84 S.Ct. at 726 (1964) (Emphasis added).

Following the announcement of the *Times* decision, commentators expressed divergent views as to which of the constitutional tests [4] the Court relied upon in reaching the *Times* result.[5] This matter in part was put to rest by the remarks of Justice William Brennan, Jr. in a paper delivered as the Alexander Meikeljohn Lecture at Brown University on April 14, 1965. The lecture, entitled "The Supreme Court and the Meikeljohn Interpretation of the First Amendment", 79 Harv.L.Rev. 1 (1965), in part stated:

"[T]he Court examined history to discern the central meaning of the first amendment, and concluded that the meaning was revealed in Madison's statement 'that the censorial power is in the people over the Government and not in the Government over the people'". 79 Harv.L. Rev. 1, 15 (1965).

3. However, in 1961, the state legislature proscribed the Communist Party with regard to any rights or recognition as a political party in Arizona, by reason of its "dedication to the proposition that the present constitutional government of the United States, the governments of the several states, and the government of the state of Arizona and its political subdivisions ultimately must be brought to ruin by any available means, including resort to force and violence." A.R.S. § 16–205. Arizona Communist Control Act. (1961).

4. "Clear and present danger", (Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)); "redeeming social value", (Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)); or "balancing" (see Konigsberg v. State Bar, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961)).

5. See, e.g. Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment", 1964 Supreme Court Review 191 (Kurland ed.).

For Alexander Meikeljohn, the First Amendment and its "central meaning" absolutely forbade *any* encroachment upon its freedoms from any quarter. Meikeljohn, The First Amendment Is An Absolute, 1961 Supreme Court Review 245. And, Justice Black, in a concurring opinion in the *Times* decision in which Justice Douglas joined, expressed a similar view:

"I base my vote to reverse on the belief that the First and Fourteenth Amendments not merely 'delimit' a State's power to award damages to 'public officials against critics of their official conduct' but completely prohibit a State from exercising such a power." 376 U.S. 254, 293, 84 S.Ct. 710, 733 (1964). And see Black, The Bill of Rights and the Federal Government in THE GREAT RIGHTS (Cahn ed. 1963).

The majority of the Court as yet do not subscribe to the absolutist philosophy, for as was stated by Justice Brennan further on in the Meikeljohn Lecture:

"Note that the *New York Times* principle has an important qualification: it does not bar civil or criminal libel actions for false criticism of the official conduct of a public official if that criticism is made with knowledge of its falsity or in reckless disregard of whether it was false or not. *The underpinning of that qualification is the 'redeeming social value' test.*" 79 Harv.L.Rev. 1, 18–19 (1965) (Emphasis added.)

The 'redeeming social value' test (in the context of *Times*) implies that though a communication or publication may have been privileged when made or published, its privileged status is defeasible upon a showing that the publisher was motivated by actual malice—knowledge of falsity, or reckless disregard for whether that which spoken or published was false. Therefore, in order for a publication or utterance to retain its privileged status, it must, in the marketplace of ideas and opinions, be of redeeming social value.

This view is buttressed by the later opinion of the Court in the case of Garrison v. Louisiana, 379 U.S. 64, at page 75, 85 S.Ct. 209, at page 216, 13 L.Ed.2d 125 (1964) where it is stated:

"The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. [Citations] That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which *'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * *'* Chaplinsky v. New Hampshire, 315 U.S. 568, 572 [62 S.Ct. 766, 86 L.Ed. 1031]. *Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.*" (Emphasis added.)

As a further elaboration upon the constitutional rule announced in *Times*, vis-a-vis "malice", the Court in Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) noted:

"Its [New York Times] definition of 'actual malice' is not so restrictive that recovery is limited to situations where there is 'knowing falsehood' on the part of the publisher of false and defamatory

matter. *'Reckless disregard' for the truth or falsity, measured by the conduct of the publisher,* will also expose him to liability for publishing false material which is injurious to reputation." 388 U.S. at 164, 87 S.Ct. at 1996. (Emphasis added.) And, in summary, the Court has held in Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966):

"[T]he most repulsive speech enjoys immunity provided it falls short of a *deliberate or reckless untruth.* But it must be emphasized that malicious libel enjoys no constitutional protection in any context." 383 U.S. 53, 63, 86 S.Ct. 657, 663 (1966). (Emphasis added.)

It is incumbent upon this Court to examine our cases dealing with libel of public officials to determine whether the standards announced therein square with the constitutional principles which bind this Court in the disposition of this appeal.

### 2.

■■ The trial court, in addition to its ruling on the question of libel per se, found that the publication was a qualifiedly privileged communication, the occasion for its privileged status being plaintiff's public speech given at a time when plaintiff was Attorney General of this State. The rule of *Times* is a constitutional rule of privilege, and we are bound to meet its requirements. Our prior decisions regarding what circumstances constitute an occasion for such privilege require that publications about matters of public interest and concern are to be accorded wide latitude, and that only proof of *actual malice* and falsity will defeat the privilege and allow an award for damages. See Phoenix Newspapers v. Choisser, supra, 82 Ariz. at 277,

312 P.2d at 154; Broking v. Phoenix Newspapers, 76 Ariz. at 340, 264 P.2d at 416.

■ The question arises whether the Arizona standard of "actual malice" meets foursquare the *Times* standard. We previously have held that "Malice cannot be inferred from an article published on a privileged occasion alone. * * * The malice which plaintiffs must establish is not legal malice or malice at law, but it must be actual malice, malice in fact, express malice". Phoenix Newspapers v. Choisser, 82 Ariz. at 278, 312 P.2d at 155.[6] The constitutional requirement forbids any presumption of malice, or inference of malice and makes it the burden of plaintiff to prove actual malice. New York Times v. Sullivan, 376 U.S. 254, 284, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We believe that our cases dealing with the question of malice and its substance clearly meet the rigid requirements of the *Times* rule, and particularly the later decision in Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) which held:

"[O]nly those false statements made with the high degree of awareness of probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions." 379 U.S. at 74, 85 S.Ct. at 216 (1964).

### 3.

■ The crucial, and dispositive determination to be made on this appeal is whether plaintiff at trial introduced evidence sufficient to submit to the jury the question of malice and falsity as defined by *Times* and the cases following thereafter. Moreover, that evidence must be of "convincing clarity" to satisfy the constitutional standard. *Times,* supra, 376 U.S. at 285–286, 84 S.Ct. 710. To prove actual malice[7]

---

6. This rule of malice was cited approvingly in New York Times v. Sullivan, 376 U.S. at 280, footnote 20, 84 S.Ct. 710.

7. It is of interest to note the view expressed by Justice Black regarding the "malice" requirement of *Times:*
 " 'Malice' * * * is an elusive, abstract concept, hard to prove and hard

to disprove. The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs and certainly does not measure up to the sturdy safeguards embodied in the First Amendment." (Black, concurring in *Times,* 376 U.S. at 293, 84 S.Ct. at 733.).

is indeed a heavy burden to be borne by the plaintiff here, and that is as it should be. Otherwise, the use of a libel suit as a means for stifling free debate and discussion of important matters of our times would be greatly increased, with the result that

"The threat of being put to the defense of a lawsuit brought by a * * * public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, * *" Washington Post Co. v. Keogh, 125 U.S. App.D.C. 32, 365 F.2d 965, 968 (1966).

We are therefore in accord with the principle of privileged communication regarding a public official, even where the defamatory publication is false, but must also apply the proviso that it was not made "with knowledge of its falsity or in reckless disregard of whether it was false or not". New York Times v. Sullivan, supra. Since the jury by its verdict must have found that the editorial was made either with knowledge that it was false, or with reckless disregard of whether it was false, we examine the record to determine whether there was sufficient evidence to sustain such finding.

The evidence presented at the trial clearly disclosed that plaintiff was neither a communist nor sympathetic with communist theology or ideology. The overwhelming weight of the evidence adduced from both defendants' and plaintiff's witnesses demonstrated that to label plaintiff as a communist or impute to him ideologies which inclined to communism would be to utter a gross untruth.

The evidence introduced with regard to the inspiration for, the preparation, and the approval of, the editorial is illuminating on the question of malice. Plaintiff proceeded on the theory that the editorial demonstrated unequivocally a reckless disregard for fair and factual commentary respecting the speech delivered to the convention in Flagstaff on May 7. Defendant Padev, author of the editorial, testified that he did not hear the speech, and that he was not present in Flagstaff on May 7. He testified:

"Q. Let me ask you this question, and I want it clearly understood between you and me what the import of it is, as pertaining to your obtaining information, the information that you obtained before you wrote this editorial, and for the purpose of writing this editorial was based upon the report, printed report, of your reporter in your newspaper and what you heard over the radio, am I right?

"A. You are right.

"Q. From no other source?

"A. Two newspapers, not one.

"Q. From no other source?

"A. Yes, sir."

He testified that the phrase "people's council" was the basis for his editorial comment; that the idea of a people's council was a "very dangerous idea indeed". Quite obviously, the meaning Padev attributed to the phrase "people's council" was not the meaning intended by Church, and a cursory examination would have revealed the discrepancy.

Mr. Padev testified that he had not heard the speech. His further testimony appears as follows:

"Q. Prior to the time you wrote this editorial, did you suspect this man of being possessed with communistic inclinations?

"A. No, sir.

"Q. Have you since?

"A. No.

"Q. You don't today?

"A. No, I don't. I certainly don't, no.

"Q. You made no investigation to obtain the factual matters as printed in that editorial, except from what you heard?

"A. What investigation? I knew what I knew, which was, I think, enough about the council, the *communist council device*. And it was a fact that Mr. Church had made a speech and recom-

mended a device which could have been, or could be, usually it is, used by the communists, and I attacked the idea." (Emphasis added).

Throughout his testimony defendant Padev insisted that it was not plaintiff Church he was attacking but "Mr. Church's idea of the people's council". He further testified that "there is nothing communistic about Mr. Church's ideas either" and that there was nothing communistic about Mr. Church's speech.

It is a matter of general knowledge, particularly among persons familiar with communist vocabulary, that many words and phrases in common usage by non-communists when used by communists, have a completely different connotation and meaning. See J. Edgar Hoover, Masters of Deceit (reference to communist use of "Aesopian language") 1957. Also, Harry and Bonaro Overstreet, The War Called Peace (chapter 9, "Speaking in Tongues") 1961. Defendant Padev testified to considerable first hand knowledge of communist procedures and therefore was without doubt aware of these semantic differences. The newspaper reports, as well as plaintiff's actual speech clearly demonstrated the ordinary meaning of the phrase "people's council," particularly in view of Padev's testimony above.

An editor of the *Republic*, Frederick Marquardt, testified that it was his duty to approve all editorials before publication. He stated, however, that in this particular instance he did not approve the editorial before publication, did not read it before publication, but did know the general contents of the editorial and knew what the title was to be. To the question why he had not approved it, he replied that defendant Pulliam, the publisher, had approved the editorial. The evidence developed that defendant Pulliam was out of Phoenix on the day of approval; that Pulliam had telephoned the offices of the *Republic*, for general purposes, and had talked with Padev about the proposed editorial. Pulliam did not have a copy of the proposed editorial

nor is the evidence entirely clear that he knew precisely how it was phrased.

Defendant Pulliam testified that he had read the newspaper report of the Church speech in his own paper. He futher stated that defendant Padev had telephoned him and called his attention to the phrase "people's council" which disturbed him (Pulliam) and that "there is probably nobody in America who understands communism like he (Padev) does".

Defendants Pulliam and Padev and the witness Marquardt all testified that they had no belief that plaintiff Church was a communist, and the witness Marquardt stated that he had no knowledge or belief that Church had any sympathy for the communistic philosophy.

Michael Padev was qualified as an expert on communism at trial. Much of his testimony was directed to how the "people's council" device was a convenient means for communists to take over non-communists governments. In the face of the evidence regarding plaintiff's actual speech, and the newspaper reports thereof which referred to "a people's council" in the clearly expressed meaning of a lobby group to offset the "excessive influence" being exerted on the legislature by other such groups, or "councils," Padev steadfastly asserted that the council proposed by Church could surely be the first step to communism in Arizona government. Padev was asked:

"Q. You know that communism thrives on animosity and destruction of the enemy, and you knew, didn't you, that the editorial would destroy this man, didn't you?"

He replied:

"A. I wasn't thinking of Mr. Church, I was thinking of Mr. Church's proposal, people's council.

"Q. If you weren't thinking of Mr. Church, why did you say very first up there 'Communism and Mr. Church'?

"A. That was taking the two facts together, communism, and the Church speech at Flagstaff on the other hand,

and the editorial tried to discover what was the relationship between the two."

The defense proceeded on the theory that every statement of the editorial was true or substantially true. Padev again testified at length upon communist theory, the revolution in Russia, the great and abiding fear he had in a communist takeover in America, and the strong possibility that the people's council proposed by plaintiff would be the vehicle for communist domination of Arizona.

Padev revealed his true belief and state of mind in the following testimony:

"A. Well, the latest one which really made me write the editorial was the proposal, the people's council proposal, he set forth in his Flagstaff speech.

"Q. Why did you consider that left-wing?

"A. It is very left-wing, because, first he says this is a shabby world unless we correct it. This is awful, you know. *This is one of the most effective methods of left-wingers and of communists of attacking the free enterprise system.* You create the impression that every-

thing is awful. He said shabby world, 'our children will live in a shabby world,' and things like that. It is very bad.

"Second, he says the legislature is controlled by the Adams Hotel. *Now, in Russia they used to say that the legislature was controlled by the—they used to call it the Astoria Hotel. That is where the bankers were going. In Marx, you will see he says the same thing, that it is controlled by the stock exchange. These are standard expressions, routine expressions, by people belonging to the left-wing who want to undermine the confidence which people have in their own legislature.* Now, if you say the legislature is run by the Adams Hotel —how many people can you put in the Adams Hotel—you don't believe in voting any more. It means that the legislature elected by the people is controlled by about ten people in the Adams Hotel. This is a very, very dangerous idea.

"Q. This is why you considered it dangerous?

"A. Yes, sir. Yes, sir, left-wing and dangerous." (Emphasis supplied.)[8]

8. Plaintiff introduced into evidence the column of Claiborne Nuckolls published in the *Arizona Republic* on March 29, 1959. This piece of political commentary, set out below, expresses a position not unlike that advanced by plaintiff in his speech on May 7, 1959.

"THE STATE WE'RE IN
 By Claiborne Nuckolls
"IF ANYONE doubts there exists a 'third house' of the Arizona Legislature that amounts almost to an invisible government, such doubts would have been dissipated had they been able to watch the recent legislative session from the sidelines as this reporter did.

"It is a house composed of lobbyists and other representatives of special interests, for the most part selfish in their goals. Its influence on what the lawmakers did or did not do was perhaps stronger, more dominating than this observer has ever seen before, particularly in the state senate.

"What and who are the interests that comprises the 'third house'? First come the copper mines. And don't believe for a moment that the political

power of the mining interests has waned.

"Unrelenting opposition of this group almost succeeded in blocking any kind of school finance legislation and did in fact, result in passage of a measure that falls far short of the type of bill that Governor Fannin wanted. That any kind of bill at all was passed I attribute to two things primarily: (1) the governor's refusal to be cowed by the mining spokesmen, and (2) the backing given him in the less copper-collared house of representatives.

"RANKING NEXT in importance as members of the 'third house' come the railroads, the utilities and the pipeline corporations. However, it is to the credit of the railroads and utilities that, so this column is informed by responsible sources, they finally saw the need for and went along with school aid legislation.

"Railroad lobbyists, however, did push through a law requiring the public to bear half the costs of installing safety signal devices at grade crossings, and the utilities nearly got through a bill

Clearly, this testimony could have been considered by the jury to be persuasive in determining whether the editorial was actuated by actual malice.

To the extent that Padev was qualified to testify as to communist theory, institutions, and devices, the factual basis of the statements of the editorial regarding those subjects may be accepted. Yet this could not necessarily overcome the knowledge of falsity of the statements of fact as applied to what the plaintiff proposed in his speech, as shown by the reportorial accounts immediately following it, and which both defendants Padev and Pulliam testified they had read before the editorial was published.

 Defendants complain of the trial court's refusal to give an instruction on the defense of fair comment. We agree this should have been done. "Fair comment" is a form of qualified privilege applied to publications of the news media. It is limited to discussions of matters which are of legitimate concern to the community as a whole because they materially affect the interests of all the community. See Prosser, Law of Torts, 3rd ed., § 110 (1964), and cases cited. Under the ruling in *Times*, it extends not only to expressions of opinion, but likewise to false statements of fact, unless made with "actual" malice, as defined in *Times*. If the jury finds such actual malice, the defense of fair comment is defeated:

"Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of

requiring the state to pay costs of relocating utility facilities on highway rights of way when space occupied by these installations is needed for highway purposes.

"Some representatives of the insurance industry almost prevented passage of a bill permitting state highway patrolmen to retire at a younger age than now is allowed.

"This column is informed that the liquor industry was quite active in lobbying against certain phases of proposed stronger traffic control legislation, particularly as regards stiffer penalties and more certain and sure punishment for drunk driving.

fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. *Both defenses are of course defeasible if the public official proves actual malice, as was not done here.*" *Times*, 376 U.S. at 292, 84 S.Ct. at 732.

The questions at the conclusion of the article proved to have the most significant impact upon plaintiff and doubtless had the same effect upon the reading public. During testimony of defendant Pulliam, the following occurred:

"Q. And you knew what the consequences of publication of that article would mean, didn't you? Didn't you know what consequences of that publication would mean?

"A. I don't know whether I knew what the consequences of any publication will be. I couldn't possibly expect to know what the consequences are.

"Q. You knew that you would get letters such as Mrs. Stanlis's letter, did you not, Mr. Pulliam?

"A. I didn't know whether we would get a single letter or not. How could I know?

"Q. Well, do you know what impact this made upon your reading public?

"A. No, I don't.

"Q. Well, let me read you what impact it made, printed by your own paper.

"'Good Work' Exhibit No. 6

\* \* \*

"However, the influence of lobbyists was apparent in connection with virtually every major piece of legislation passed by the last legislative session.

"I am reminded of what Johnny Johnson, former representative from Parker, once said as he ran the gantlet of lobbyists after emerging from the house chamber:

"'There's nothing wrong with the legislature except there's too many lobsters around here. Every time I come out of that door a dozen lobsters grab me and try to lobster me.'"

"EDITOR, THE ARIZONA RE-
PUBLIC:

"I want to congratulate you on the fine job you are doing in exposing communists in government.

"I had heard Mr. Church on TV in the last campaign and must admit I was completely fooled. In fact, I actually went out and worked for the man.

"Prior to reading your editorial I had never heard of these 'people's councils'. I suggest you take the initiative in starting a recall at once.

"Keep up the good work."

\* \* \*

"Q. And do you think any other people thought like she did?

"A. I don't know.

"You don't. Well, let me show you Exhibit No. 7 and ask you if that is not an expression of what impact this editorial made upon your reading public?

"A. Well, this is certainly a very fine defense of Mr. Church, and we printed it.

\* \* \*

"Q. Let me show you Exhibit 8 for identification and ask you if that is an-

other reader impact that you printed in your newspaper?

"A. Well, this letter says a lot of worse things about us than we ever said about Church."

Exhibits 7 and 8 are set out below.[9]

■ This and other similar testimony appearing in the record, was relevant for the purpose of showing damages, and the jury could have concluded that plaintiff was entitled to punitive damages as a result of the publication.

The final point which must be discussed is the matter of the court's instructions to the jury on the substantive law applicable to the case.

After instructing the jury that the court had found the editorial to be libelous per se and qualifiedly privileged, the jury was instructed that in order for plaintiff to prevail, it must find the editorial was false and was actuated by actual malice. On the matter of falsity, the court properly instructed that:

"\* \* \* [I]t is not necessary that the editorial be literally true in every detail. If the editorial is substantially true so as to justify its gist and the reasonable inferences therefrom, or if the plaintiff

---

9. *Plaintiffs' Exhibit No. 7:*
"Ruined Breakfast
"Editor, The Arizona Republic:
I am a Republic subscriber, I also read The Republic.
"I like The Republic. I realize that it is an opinionated paper.
"I do not know Wade Church. The majority of the voters in this state do know something about him, however.
"The editorial attack on Wade Church on May 11 must have ruined thousands of breakfasts. I mean good Republican breakfasts. I, for one do not care to have my intelligence insulted before nine in the morning. God save the intelligence of poor Mr. Church.
"This front page fiasco smacks of your most junior editorial writer, reflecting a sorry animosity of his employer, turning out a scorcher, paying no attention to truth, logic, relevance, or good taste.
"Gentlemen, the day is past when the best way to smear a man is to scream, 'Communist!'

"The editorial was far out of character for The Republic. I remain a subscriber and a reader. Not a Communist."
*Plaintiffs' Exhibit No. 8:*
"Church Defended
"Editor, The Arizona Republic:
"So you are up to your old trick of destroying those who get in your way or expose your racket. Racket it is, and just as bad as any labor rackets that have been getting publicity.
"Big Business racketeering is not publicized, but is equally guilty. Wade Church is a fine man with a fine family. He would fight racketeering wherever he found it. Because he is courageous enough to expose the truth of the way our legislature works, he has laid himself wide open to your wrath.
"You do not like opposition. Your philosophy is 'rule or ruin.' Perhaps you have gone a bit too far this time. Let us hope so, for the good of the people of Arizona."

does not establish by a preponderance of the evidence that the article and reasonble inferences therefrom is not substantially true, then your verdict must be for the defendants."

The instruction regarding malice, to which defendants object, is as follows:

"Actual malice may be inferred from the wrongful motive in the publication of the matter, if such be shown, or may be inferred from the absence of proper caution or want of proper justification for the publication of the matter, if such be shown, lack of good faith, if such be shown, or wanton or reckless disregard of the truth in publicizing the matter in the publication, if such be shown."

■ It seems obvious, from an examination of the proposed instructions on malice submitted by both plaintiff and defendant, that the trial court considered carefully the established legal basis for each instruction. However, New York Times v. Sullivan, supra, was not decided until nearly a year after trial of this matter. Consequently, failure to apply the principles enunciated therein at the trial of this case is not an adverse reflection on the trial court. Nevertheless, it is clear that the United States Supreme Court has made application of the *New York Times* case retroactive, at least insofar as any cases pending in an appellate court from and after its issuance in March of 1964.

The definition of "actual" malice has been set forth, supra. And, in Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L. Ed.2d 597 (1966) the United States Supreme Court said:

"It is clear that the jury instructions were improper. * * * The trial court * * * defined malice to include 'ill will, evil motive, intention to injure. * * *' This definition of malice is constitutionally insufficient where discussion of public affairs is concerned; * * *. * * * [W]e held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was *false*

and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true."* 383 U.S. at 83–84, 86 S.Ct. at 675.

Both plaintiff and defendants requested an instruction which included the elements of "spite or ill will", which were specifically rejected in *Rosenblatt*. Even if defendants might have been entitled, after the trial, but subsequent to the *Times* decision, to attack the trial court's instruction including "spite or ill will" as evidence of actual malice, defendants in their reply brief in this appeal specifically cite *Times*, supra, yet not only do they fail to attack the instruction on this basis, but merely attempt to refute testimony "evidencing ill will".

■ Nevertheless, we are of the opinion that, measured by the rules in New York Times v. Sullivan, supra, Rosenblatt v. Baer, supra, and Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967), the trial court's instruction on "actual malice" was fatally defective in its direction that in the alternative it may be inferred by "wrongful motive in the publication of the matter * * * or may be inferred from the absence of proper caution, or want of proper justification * * * lack of good faith * * *." *New York Times* rules out "negligence in failing to discover misstatements" as constitutionally insufficient for a finding of actual malice. In St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court held that lack of reasonable care in determining whether an asserted libel was false did not conform to the *New York Times* constitutional test of actual malice, nor could such lack be considered "reckless disregard" of whether the utterance was false or true. The instruction here that malice may be inferred from "absence of proper caution" is so close, if not synonymous with the phrase "lack of reasonable care", that it cannot meet the constitutional test flatly enunciated in *New York Times* above.

We therefore hold that: the court did not err in ruling the editorial was libelous

per se, and in so instructing the jury, but that the instruction defining actual malice did not meet the required federal rule, and therefore requires that the case be reversed for a new trial.

Reversed and remanded with directions for further proceedings in accordance herewith.

McFARLAND, C. J., concurring.

STRUCKMEYER, Justice (specially concurring).

Since there are divergent opinions by the members of this Court as to the proper disposition of this case, I feel that it is desirable to briefly express the basis for my concurrence with Justice Lockwood.

The hard core of the editorial lies in these few sentences:

"Nothing illustrates better the dangerous left-wing ideas of Attorney General Wade Church than his proposals for the setting up of a 'people's council' in Arizona. * * * THE COMMUNIST PARTY under Lenin created its own 'people's councils' which functioned * * * just the way Wade Church wants the Arizona 'people's council' to function. * * * People's councils * * * were formed with the sole purpose * * * of intimidating, blackmailing, and terrorizing the elected parliaments and district assemblies * * * The 'people's council' idea is only another name for the Communist technique of the seizure of power * * *."

These statements charge, not as an expression of opinion but as a positive assertion of fact, that Church proposed creating a people's council in Arizona to function just the way the councils that the Communist Party set up under Lenin functioned, they being formed for the purpose of intimidating, blackmailing and terrorizing legislatures and that this is the means of the Communists' seizure of power. It can only be understood to mean that Church was advocating the seizure of power through unlawful acts in the same manner as did the Communists, thereby destroying the democratic government of· Arizona. The rhetorical question, "Does he [Church] advocate Communism," having already been answered by the previous purportedly factual statements, does not ameliorate the serious nature of the charges but serves rather to drive home to the reader the conclusion that Church was indeed advocating Communism.

That parts of the editorial may be fairly susceptible of another or other interpretations, that is to say, are not libelous per se, does not detract from or exclude the clear charge that Church wished to operate in the same way as the Communists, by intimidation, blackmail and terror.

"'It is further the law in this state and elsewhere that if the language charged to be libelous is unambiguous it is the function of the court to say whether it is libelous per se.' Broking v. Phoenix Newspapers, supra [76 Ariz. 334, 264 P.2d 415]." Phoenix Newspapers v. Choisser, 82 Ariz. 271, at 276, 312 P.2d 150, at 153.

Accordingly, it is my opinion that the trial court properly instructed the jury that the editorial was libelous per se.

The jury, under the instructions of the trial court, found actual malice, malice in fact. I do not think it can reasonably be argued that there is insufficient evidence to sustain the verdict in this respect. The author of the editorial, Michael Padev, gained his information about Church's speech from a newspaper report, which is deserving of being requoted in part since, I believe, it is determinative of the question.

"CHURCH FLAYS LEGISLATURE'S 'THIRD HOUSE'

"FLAGSTAFF (Special)—Atty. Gen. Wade Church last night called for a 'people's council' to offset the special interest 'third house' which rules Arizona from Hotel Adams.

"He urged organized labor to join churches, PTAs, minority groups, and others and hire full-time personnel to match lobbyists with the mines, power

group, construction industry, finance interests, and cattle groups."

The newspaper account points out that what Wade Church meant by his use of the phrase "people's council" was to "hire full-time personnel to match lobbyists" with other interests. In representative government, lobbying is a lawful and accepted procedure for communicating the wishes of the electorate to the membership of legislatures. No stretch of the imagination can equate this democratic process with the Communist technique for the seizure of power through intimidation, blackmail and terror. The editorial is not only false but the jury could have concluded that Padev must have known it was false. From knowledgeable falsity or a reckless disregard of whether it was false, there can be inferred malice. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248; Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, reh. denied 389 U.S. 889, 88 S.Ct. 11, 13, 19 L.Ed. 2d 197, 198; Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456; Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597; Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892; Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125. See for example the statement in Curtis Publishing Co. v. Butts, supra, 388 U.S. 130 at 153, 87 S.Ct. at 1991:

> "That is to say, such officials were permitted to recover in libel only when they could prove that the publication involved was deliberately falsified, or published recklessly despite the publisher's awareness of probable falsity."

The court instructed the jury, at the appellants' request, on the issue of malice as follows:

> "Now, as previously stated, in order for plaintiff to be entitled to recover in this case, he must prove by a preponderance of the evidence not only that the editorial and any reasonable inferences therefrom complained of was false, but also that the defendants were actuated or motivated by actual malice in publishing it.

> "In this connection, you are instructed that to establish actual malice, you must find that the publication was wrongfully and intentionally published with spite or ill will towards the plaintiff, and with a desire to injure him. Mere negligence or carelessness alone is not sufficient."

The instruction does not conform to the subsequent ruling of the United States Supreme Court in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, adhered to and quoted with approval in the numerous cases since. See cases cited supra. The present interpretation of the First Amendment requires that a publication of and concerning a public official be false, and made either with the knowledge that it was false or with reckless disregard as to whether it was false.

The appellants' requested instruction was a correct exposition of the law as it then existed in Arizona. Phoenix Newspapers v. Choisser, supra; Broking v. Phoenix Newspapers, supra. Our invariable rule forbids that a litigant complain of his own requested instructions. We will not permit a party to lead the trial court into error. However, it is apparent that appellants, in good faith, attempted to apprise the trial court of the law in Arizona. This was their responsibility. They should not be charged with clairvoyance in not anticipating the course of the decision in New York Times v. Sullivan supra. The decision in that case was announced March 9, 1964. Appellants' opening brief was filed in this Court on April 20, 1964, and, while no reference was there made to the Times decision, the reply brief discussed it in detail. Further, counsel subsequently devoted the principal portion of his oral argument to the question of malice as it related to the Times decision. Accordingly, I am of the view that appellants timely raised the constitutional issue and this

Court must give it the recognition that the Supreme Court of the United States did in Curtis Publishing Co. v. Butts, supra, and Rosenblatt v. Baer, supra.

The quoted instruction has been specifically condemned in Rosenblatt v. Baer wherein the United States Supreme Court stated:

"* * * it is clear that the jury instructions were improper. * * * The trial court * * * defined malice to include 'ill will, evil motive, intention to injure. * * *' This definition of malice is constitutionally insufficient where discussion of public affairs is concerned; * * *." 383 U.S. 75 at pp. 83, 84, 86 S.Ct. 669, at p. 675.

But were this Court to consider that the appellants could not question their own requested instruction, we would still be compelled to find reversible error in the light of the appellee's requested instruction also given by the court as discussed by Justice Lockwood.

Appellants raise two further matters which should be briefly considered in order that this case be correctly disposed of on retrial. First, appellants pleaded the defense of fair comment. They urge that this is a complete defense to the action and complain that the trial court refused to give their instruction embodying fair comment. In New York Times v. Sullivan, supra, it was recognized that the defense of fair comment is defeasible if actual malice is established. (See footnote 33.)

But the failure to give an instruction on fair comment is, in my opinion, clearly reversible error. There are certain statements in the editorial which are obviously comment. The jury should be instructed alternatively that the appellants are entitled to comment fairly upon any factual statements made without actual malice but as to any comments which are derived from or follow from knowingly false statements, or statements made in reckless disregard of whether they are true or false, the defense of fair comment does not apply.

Second, appellants complain of the introduction of certain exhibits as evidence of malice. It is not necessary to comment on each exhibit but sufficient to point out that evidence of aggravating circumstances is always admissible to enhance punitive damages where tortious conduct is alleged. Lutfy v. R. D. Roper & Sons Motor Co., 57 Ariz. 495, 115 P.2d 161. On retrial, such of the appellee's evidence as shows aggravating circumstances should be admitted for consideration by the jury limited by a cautionary instruction that such evidence is admitted only for the purpose of establishing or enhancing punitive damages.

Because of the lack of adequate instructions on malice and fair comment. I am of the opinion the case must be reversed for retrial.

UDALL, Vice Chief Justice (concurring in part and dissenting in part):

I specially concur with the opinion of the majority that the judgment of the trial court should be reversed and the cause remanded with directions for further proceedings as indicated in the majority opinion.

I disagree, however, with the conclusion reached by the majority that the trial court was correct in finding the editorial libelous per se. The defendants contend that the editorial is susceptible to two meanings; one libelous, the other nonlibelous, and that—if anything—the editorial is libelous per quod and as such should have been submitted to a jury for determination. I find myself in agreement with this contention and therefore dissent from the opinion of the majority that the editorial was libelous per se.

In the editorial it is stated that the plaintiff had advanced the idea of a People's Council in Arizona to counteract the domination of special interest groups that are organized to control the legislature. The editorial quotes the plaintiff as follows:

"According to Church our legislature is 'dominated' by special interest groups operating from the Adams Hotel in Phoe-

nix. For this reason the legislature does not reflect the will of the majority of the people, the attorney general argues. To 'correct' this situation Mr. Church proposes the selection of a 'people's council' which presumably, should tell the legislature what to do and how to do it. Mr. Church thinks that this 'people's council' should be organized and run by Arizona's labor unions."

Thus, a reader of the editorial is put on notice in the very beginning that even though the editorial repeatedly uses the word "Communism" in connection with the People's Council, it is to be operated by an Arizona labor union. There is also more than a suggestion that the word "Socialism", a non-offensive appellation, has a prominent part in the editorial; for instance, the expression: "Mr. Church's 'People's Council' idea comes straight from the writings of Karl Marx, the God of scientific Socialism and the prophet of the International Communist movement." Again, at the close of the editorial the question is asked: "Does Mr. Church advocate Socialism for Arizona?" "Does he advocate Communism?"

The issues are further confused by the statement in the editorial that the "People's Council" idea was called various names: for instance, the first cabinet headed by Lenin was called "People's Council of Commissars." The Communists later used the same "Council" technique in East Europe, as well as in the Far East, including Red China, and the "People's Council" idea was called by different names, such as, "Patriotic Councils", "National Councils", "Anti-Fascist Councils"; "Democratic Councils", "Peace Councils", etc. The various names used to describe the "People's Council" seem to dilute the poison of the term as applied to Communism.

The majority opinion quotes the following language from Phoenix Newspapers v. Choisser, supra:

"* * * the entire article must be considered as a whole. * * * This is true not only with reference to its exact lan-guage but in accordance with its sense and meaning under all the circumstances surrounding its publication."

And from Afro-American Publishing Co. v. Jaffe, supra, it quotes:

"What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest."

Then in the following paragraphs certain excerpts from the article are considered which, if read alone, would give the impression the author of the editorial was attempting to charge that Mr. Church was advocating the seizure of political power in the same manner as that used by the Communists. The editorial should, however, be taken as a whole and not confined to limited excerpts.

While the editorial does stress the idea of Communism, as it relates to "People's Council", still, a reader might conclude, since "Mr. Church thinks that this 'people's council' should be organized and run by Arizona labor unions'" it was only intended to apply to a socialistic organization that would adopt one of the milder designations in describing the "People's Council", such as, "Patriotic Council", "Democratic Council", or "Peace Council".

A publication is not actionable per se if it is reasonably susceptible of an innocent, as well as libelous consideration but is actionable in such case only upon proof of special damages.

"To be defamatory per se the letter should be capable of but one meaning. 36 C.J. 1150. The words must be of such character that the law will presume the person of whom they are written to have been damaged. Words having a doubtful meaning cannot be declared as a matter of law, to be actionable per se." Ruble v. Kirkwood (1928), 125 Or. 316, 266 P. 252, 254. See also Washington Post Co. v. Chaloner, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987, 989; Becker v. Toulmin, 165 Ohio St. 549, 138 N.E.2d 391.

"A publication is actionable per se when the language used therein is susceptible

of but one meaning, and that an opprobrious one." Gentry v. Wagoner County Publishing Co., Okl., 351 P.2d 718, 720.

If a written publication is reasonably susceptible of more than one meaning, it is for the jury to determine which of such meanings was attributed to the publication by the average reader, and it is error for the trial court to instruct the jury that such publication had but one meaning as a matter of law. Central Ariz. Lt. & Power Co. v. Akers, 45 Ariz. 526, 46 P.2d 126, 131. See also, Broking v. Phoenix Newspapers, Inc., 76 Ariz. 334, 264 P.2d 413, 415, 39 A.L.R.2d 1382.

Reading the entire editorial, the ordinary man might conclude the editor was trying to give a summary of the doctrines of Marxism and to show how these doctrines were incorporated into the philosophy of Communism, with a strong implication that Mr. Church may be advocating Marxism or Socialism. Or, the ordinary man reading the editorial could get the impression that the editor—in a subtle, pointed way— was trying to say that Mr. Church was advocating Communism.

For the reasons stated, I have a difficult time in agreeing with the majority that this confused discussion of Marxism, Socialism and Communism firmly establishes that the editorial is libelous per se. I believe the matter should have been submitted to a jury with proper instructions, leaving to the jury the responsibility of deciding whether the allegations set forth in the editorial are libelous per se, or libelous per quod.

BERNSTEIN, Justice (dissenting).

The Arizona law of libel involving public officials has been so limited by the United States Supreme Court in a series of decisions beginning with New York Times

v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and continuing through St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968), that we must look to these cases as a basis for our decisions.[1]

In New York Times, supra, the United States Supreme Court said:

"We are required in this case to determine for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his official conduct."

The court further clarified its position in Rosenblatt v. Baer, 383 U.S. at 84, 86 S. Ct. at 675, when it said:

"If existing state-law standards reflect the purposes of New York Times, this is at best accidental. Our decision in New York Times, moreover, draws its force from the constitutional protections afforded free expression. The standards that set the scope of its principles cannot therefore be such that 'the constitutional limits of free expression in the Nation would vary with state lines.' Pennekamp v. Florida, 328 U.S. 331, 335, [66 S.Ct. 1029, 1031, 90 L.Ed. 1295]."

The clear intent of the United States Supreme Court is to avoid the potentially inhibiting effects that libel actions have on free and open discussion.

The New York Times decision, 376 U.S., at 268, 84 S.Ct., at 719, contains the following language:

"The question before us is whether the rule of liability, as applied to an action brought by a public official against critics of his official conduct, abridges the

1. N. Y. Times v. Sullivan, supra; Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L. Ed.2d 456 (1967); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248; St. Amant v. Thompson, supra.

freedom of speech and of the press that is guaranteed by the First and Fourteenth Amendments."

and at 269–270, 84 S.Ct. at 720:

"The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United States, 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498]. 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' Stromberg v. California, 283 U.S. 359, 369 [51 S.Ct. 532, 536, 75 L.Ed. 1117]. '[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, Bridges v. California, 314 U.S. 252, 270 [62 S.Ct. 190, 197, 86 L.Ed. 192], and this opportunity is to be afforded for 'vigorous advocacy' no less than abstract discussion.' N. A. A. C. P. v. Button, 371 U.S. 415, 429 [83 S.Ct. 328, 9 L.Ed.2d 405]."

"The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' United States v. Associated Press, 52 F.Supp. 362, 372."

The men who founded our country were well versed in history, and they knew that tyranny allowed no opposition; free and open discussion has always been the great bulwark of liberty and democratic government. There is always danger in vociferous and often venomous debate; it is also a safety valve which allows pent up emotions to escape, reducing the threat of violence and insurrection which repression breeds. Thus, great men who fathered this nation also sought to protect its existence through the establishment of constitutional guarantees, and among others, the freedom of speech and press.

In the case before this court, Wade Church, who was Attorney General of Arizona, gave a speech before delegates to an AFL-CIO convention; the subject of his speech was vigorously attacked in a front page editorial, supra, printed by the Arizona Republic a prominent and influential Arizona daily newspaper. Mr. Church immediately filed suit for libel. I do not believe that libel of a public official can any longer be classified as libel per se in view of the United States Supreme Court decisions that:

"Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error". New York Times v. Sullivan, 376 U.S. at 272, 84 S.Ct. at 722,

and

"* * * to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones". St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1326.

Since World War II, the charge that someone is a communist has become so common place that rare is the man active in public life who escapes it. Presidents of the United States, cabinet members and many of the most distinguished men in federal and state governments have fared no better. However, the consequences of imposing fear of punishment, whether by money judgments or incarceration, on free and open discussion would become the death knell of our system of government as we now know it; when hope, imagination and the right of dissent are stifled the freedom of men ends. The price is too high to pay for the protection of public officials against "* * * vehement, caus-

tic, and sometimes unpleasantly sharp attacks on government and public officials". New York Times v. Sullivan, 376 U.S. at 270, 84 S.Ct. at 721.

The New York Times decision, supra, at 273, 84 S.Ct. at 722, also quoted the following:

"The climate in which public officials operate, especially during a political campaign, has been described by one commentator in the following terms: 'Charges of gross incompetence, disregard of the public interest, communist sympathies and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent.' Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875 (1949)."

As Attorney General, Mr. Church knew that his words were newsworthy and carried great weight. His speech calling for creation of "people's councils" and attacking everyone in sight, the newspapers, the legislature, the mining companies, public utilities, railroads, etc., was certainly not placid and virtually invited attack.

The speech surely was a matter of public concern and as the New York Times case said:

"* * * 'public men, are, as it were, public property,' and 'discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled.'" 376 U.S. at 268, 84 S.Ct. at 720.

In St. Amant v. Thompson, supra, the court said that in order for a public official to sustain a judgment in a defamation action the rule of New York Times must be correctly interpreted and applied, namely,

"* * * that the plaintiff in such an action must prove that the defamatory publication 'was made *with actual malice*'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (Emphasis added.)

Mr. Church had the burden of proving that the appellants did so act and he failed to carry that burden. The record shows that the appellants did not believe that Church was a communist or a communist sympathizer. Some testimony was presented that after admitted baiting by an agent of Church's, one of the appellants said "We'll still finish your buddy Church." This statement is not such proof as is required of *actual malice*. It was an intemperate response, after deliberately arousing a man's anger, as to the political intent to vote Church out of office. It's the privilege of any American to support for election his friends and vote out people he dislikes for any reason.

The present standards for proving libel were clearly defined in the St. Amant decision, supra, wherein the court said:

"Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In New York Times, supra, the plaintiff did not satisfy his burden because the record failed to show that the publisher was *aware of the likelihood* that he was *circulating false information*. In Garrison v. Louisiana, 379 U.S. 64, [85 S.Ct. 209, 13 L.Ed.2d 125] (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the *necessity* for a showing that a *false publication was made* with a *'high degree of awareness of * * * probable falsity.'* 379 U.S., at 74, 85 S.Ct. 216. Mr. Justice Harlan's opinion in Curtis Publishing Co. v. Butts, 388 U.S. 130, 153, [87 S.Ct. 1975, 18 L.Ed.2d 1094] (1967), stated that evidence of *either deliberate falsification or reckless publication* 'despite the publisher's *awareness of probable falsity*' was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact *entertained serious doubts* as to the *truth of his*

*publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."* (Emphasis added.)

I do not find from the evidence that Mr. Church proved actual malice, that the editorial was either a deliberate falsification or a reckless publication or that the publishing was done with such doubts as to its truth, as to show reckless disregard for truth or falsity from which actual malice could be demonstrated. The editorial vigorously attacked the theme of Church's speech, the need to establish "people's councils".

The arena of politics is not for the thin skinned. As one of our former great Presidents, Harry S. Truman, said on politics "If you can't stand the heat, stay out of the kitchen."

The United States Supreme Court has repeatedly said that the national welfare demands open and robust debate, which includes the freedom of the press to question and attack the words and deeds of those who hold and those who aspire to high office.

Conflicting ideas, often diametrically opposed, are the seeds of a progressive democracy, and this must be a fundamental principle of our government. The dialogue of freedom, is more often than not, sharply divided. The art of persuasion frequently invokes exaggeration, caustic commentary and vilification of prominent men. The false statement is not unknown. However, from this seeming turmoil our people have forged the greatest democracy history has ever known.

It is not libelous for a newspaper, in attacking a political speech made by a public official, to point out that said official has proposed a political contrivance (People's Councils) which historically had been utilized by the communists to seize power, and to editorially state that the speaker should clarify to the public his position on communism in advocating such a proposal. This constitutes fair comment under the First Amendment of the United States Constitution and does not impute

that the public official is a communist or communist sympathizer. It is the right a newspaper has in free society, and does not libel Mr. Church.

For the foregoing reasons, I would reverse the trial court and dismiss the complaint.